## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>DENNIS GRIMSLEY,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>v.</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td>Civil No. 24-2907-BAH</td></tr>
<tr><td>SIMSPACE CORPORATION ET AL.,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Defendants.</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Dennis Grimsley ("Grimsley" or "Plaintiff") brought suit against SimSpace Corporation ("SimSpace") and William E. Hutchison ("Hutchison") (collectively "Defendants") in the Circuit Court for Anne Arundel County alleging violations of the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Labor & Empl. § 3-501 et seq. *See* ECF 2. Grimsley's complaint arises from Grimsley's role as Vice President of U.S. Federal Sales at SimSpace between 2022 and 2024, and he seeks allegedly outstanding commissions from Defendants on at least seven "SimSpace deals closed in [] Grimsley's territory during his employment." *See id.* at 7. Defendants removed the action to this Court on the basis of diversity jurisdiction. *See* ECF 1. Pending before the Court is Defendants' motion for summary judgment. ECF 21. Grimsley filed an opposition, ECF 23, and Defendants filed a reply, ECF 26. All filings include memoranda of law and exhibits.[1] The Court has reviewed all relevant filings and finds

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

that no hearing is necessary.[2]  *See* Loc. R. 105.6 (D. Md. 2025).  Accordingly, for the reasons stated below, Defendants' motion for summary judgment is **GRANTED**.

## I.    BACKGROUND

### A.    Factual Background[3]

In 2015, Hutchison, as Chief Executive Office ("CEO"), and Lee Rossey, as Chief Technology Officer ("CTO"), co-founded SimSpace, "which provides cyber-attack trainings and emulations to businesses in both the public and private sectors through innovative cyber range technology." ECF 21-2, at 10; *see also About Us*, SimSpace, https://simspace.com/company-story/ [https://perma.cc/2HCY-8Y2J] (last visited Jan. 27, 2026); ECF 21-4, at 4, 7:1–8 (deposition of William Hutchison); ECF 21-16, at 2 (declaration of William Hutchison).  Hutchison and Rossey each own 18% of SimSpace's stock, respectively.  ECF 21-4, at 7:9–17.

Grimsley met Hutchison around 2011, while both men were serving in the United States military at United States Cyber Command.  *Id.* at 5, 8:3–9; ECF 21-5, at 8, 24:4–17 (deposition of Dennis Grimsley); ECF 21-6, at 3–4; ECF 21-16, at 2.  Hutchison left military service in 2014 and went on to co-found and work at SimSpace as its CEO, which was also his first private employment

---

[2] Accordingly, Defendants' request for a hearing on the motion, ECF 22, is denied.

[3] In their memorandum attached to the motion for summary judgment, Defendants include a "Statement of Undisputed Material Facts."  *See* ECF 21-1, at 10.  Grimsley includes in his opposition memorandum a numbered "Statement of Material Facts in Dispute," *see* ECF 23-1, at 5, along with a response to Defendants' factual statement in an exhibit attached to his opposition, *see* ECF 23-2.  Defendants argue that "Neither Rule 56 of the Federal Rules of Civil Procedure or this Court's Local Rules permit such a Statement."  ECF 26, at 6.  In truth, neither the Federal Rules nor this Court's Local Rules have much to say about how precisely parties should lay out facts (in dispute or undisputed) in their briefing on a motion for summary judgment.  Defendants' argument more likely takes issue with Grimsley's exhibit on the basis that, if added to his memorandum, it exceeds the page limits applicable to memoranda in support of a motion or an opposition thereto.  *See* Loc. R. 105.3 (D. Md. 2025).  Regardless, the Court views the approach both parties' have taken here as generally helpful in organizing the factual record.  Accordingly, the Court considers all factual assertions as submitted by the parties.

after his military service.  ECF 21-4, at 5, 8:12–16.  Grimsley later worked for Point3 Federal

("P3F"), a subcontractor to SimSpace on a government contract from 2017 to 2021.  ECF 21-5, at

9, 25:6–20; ECF 21-6, at 2.  Thereafter, Grimsley worked as the Director of Business Development

at Leidos from 2021 to 2022.  ECF 21-5, at 10–12, 38:3–40:4; ECF 21-6, at 2.

      1.    <u>The 2022 Offer Letter</u>

Beginning in summer of 2022, Grimsley and Hutchison began communicating about

Grimsley joining SimSpace and Grimsley's potential compensation were he to do so.  *See* ECF

21-7; ECF 21-8; ECF 21-9.  In an email exchange between Grimsley and Hutchison in September

of 2022, Grimsley indicated that SimSpace was perhaps "the only place that would make [him]

consider leaving [his] current job" because he "underst[oo]d" what Hutchison was "trying to do"

and thought SimSpace had "a great story to tell."  ECF 21-7, at 5.  Grimsley indicated to Hutchison

that he was currently the Director of Business Development at Leidos with a base salary of "230K

w/24k in bonus to date pending [his] year end performance . . . which typically [fell] between 9-

10% of [his] base."  *Id.*  At his deposition, Grimsley specified that he did not actually receive any

incentive payments at Leidos because "Leidos does not compensate until you sell something over

$100 million, and I did not close a deal over $100 million during my time there."  ECF 23-9, at

12, 39:1–19.  Grimsley also noted in his email to Hutchison that Grimsley had been asked to apply

for a former boss's position, which would have been "260-300k w/ 25% incentive."  ECF 21-7, at

5.  Hutchison stated the next day that he sought to "move forward with an offer that [would]

outcompete the pending [Leidos] position."  *Id.* at 4.  Hutchison later indicated that "[w]e typically

based our sales compensation using an On-Target Earnings arrangement . . . and formulate the

structure from there."  *Id.* at 2.

SimSpace Chief Financial Officer ("CFO") James Gerber and Chief of Staff Ronald

Gorman were eventually made aware of Hutchison's communications with Grimsley and of

Grimsley's proposed compensation package. *See* ECF 21-10; ECF 23-4, at 26, 97:12–17. On September 18, 2022, Hutchison sent an email to Gerber, proposing that Grimsley should have a base salary of $260,000, a sales target of $2 million, and a base commission rate of $25%. *See* ECF 21-10, at 3. Gerber responded that a "more normal" base commission rate would be "10%," because "[a] 25% commission . . . on a $2m quota means you would have to pay him $500,000 on top of his base salary if he achieved that." *Id.* at 2. Gerber ultimately proposed a $260,000 base salary, a 12% base commission rate on an annual quota of $2 million, and a windfall review for any contract that had an actual contract value ("ACV") of greater than 80% of the quota, among other things. *Id.* Gerber remarks that the proposed offer would be "unusually rich, but if [Grimsley] is the guy, it is worth it in the near term." *Id.* Gerber also forwarded his proposal to Gorman. *See id.*

On September 21, 2022, Hutchison sent Grimsley an email with an outline of an offer of employment, hoping to "get [Grimsley's] thoughts" on it. *See* ECF 21-11, at 3. In the email, Hutchison noted that the base salary would be $260,000, there would be a 12% base commission rate on an annual quota of $2 million "for all deals originated and managed to a win," and a "windfall review for any contract that ha[d] an ACV of >80% of quota." *Id.* After some back and forth over the phone, on September 23, 2022, Hutchison sent Grimsley a follow-up email purporting to answer some his questions, and stating in relevant part that Grimsley "would earn a 12% commission for sales up to $2M (so, if you secured a $100k contract, you would earn $12k), "[u]psells originated by you – yes you would earn a commission." *Id.* at 2; ECF 21-16, at 2. The same day, Hutchison extended a formal "SimSpace offer letter" to Grimsley (the "2022 Offer Letter"). *See* ECF 21-12, at 2.

The 2022 Offer Letter stated that, "[o]n behalf of the SimSpace Corporation, I am pleased to offer you employment with the Company."[4] ECF 21-13, at 2. The letter identified Grimsley's position as "Vice President of US Federal Sales . . . reporting to the CRO [Chief Revenue Officer]" and listed his start date as "10 October 2022." *Id.* The letter also indicated that Grimsley's base salary would be $280,000 and that SimSpace "will pay you an annualized on-target commission of $240,000," the "specifics" of which would be "detailed in your 2022 Sales Compensation Plan, which will be provided to you in your first week with the company." *Id.* The letter further provided that Grimsley could receive a total of $590,000 in "on-target earnings . . . upon achievement of [his] sales target," stating expressly that "on-target earnings" included "two components: base salary . . . and at-risk earnings," the latter of which expressly included Grimsley's commission. *See id.*

Although a "2022 Sales Compensation Plan" was referenced in the 2022 Offer Letter, and Hutchison testified that one existed, *see* ECF 23-4, at 7, 20:18–20, no such plan was produced in discovery. Moreover, Hutchison testified that he was "not sure" a 2022 Sales Compensation Plan was ever provided to Grimsley, *id.* at 21:15–18, and Grimsley stated that he never received one, ECF 23-5, at 2 ¶ 1 (declaration of Dennis Grimsley). The 2022 Offer Letter specified that "you may not accrue a commission . . . after your employment with the Company has terminated, regardless of the reason for termination." *Id.* The letter also stated that the "[c]ommission arrangement [would] be subject to periodic review and adjustments at the Company's discretion."

---

[4] The 2022 Offer Letter specified that Grimsley's employment would be on an "at will" basis. ECF 21-13, at 3. Grimsley affirmed at his deposition that he is not challenging the termination of his employment. ECF 21-5, at 22–23, 77:19–78:5.

*Id.* At his deposition, Grimsley stated that he read the 2022 Offer Letter to contain a promise of commissions. *See* ECF 21-5, at 16–17, 59:6–60:9.

Under a section titled "Interpretation, Amendment and Enforcement," the 2022 Offer Letter stated that it, along with other agreements not relevant to this litigation,[5] "constitute[d] the complete agreement between you and the Company, contain[s] all of the terms of your employment with the Company and supersede[s] any prior agreements, representations or understandings (whether written, oral or implied) between you and the Company." *Id.* at 3. The letter further provided that "[t]he terms of this Offer Letter and the resolution of any disputes at to the meaning, effect, performance or validity of this Offer Letter" would be "governed by Massachusetts law."[6] *Id.* The 2022 Offer Letter was signed by Hutchison. *Id.* at 4. Grimsley signed the letter on September 27, 2022, and returned it to Hutchison via email the same day. *Id.*; 21-14, at 2; *see also* ECF 21-5, at 14, 52:15–20 (when asked whether the exhibit "accurately capture[d] how you were to be compensated at SimSpace starting on October 10th, 2022," Grimsley stated "Yes").[7]

---

[5] Those agreements included "the Employee Non-Competition, Non-Solicitation, Confidentiality and Assignment Agreement," which Grimsley signed on the same day as the 2022 Offer Letter, *see* ECF 21-13, at 5–9, and "any plans and agreements applicable to the equity grants referred to" in the 2022 Offer Letter, *see id.* at 2–3.

[6] The 2022 Offer Letter also contained a choice of forum clause, stating "[y]ou and the Company submit to the exclusive personal jurisdiction of the federal and state courts located in the Commonwealth of Massachusetts in connection with any Dispute or any claim related to any Dispute." ECF 21-13, at 3. No party has discussed or otherwise sought to enforce the choice of forum clause in this litigation, and so the Court does not address it further.

[7] As a term of his employment, Grimsley also agreed to accept a pro-rated "Management by Objectives," or "MBO," payment for the period from October 10, 2022 through January 31, 2023 in the amount of $30,000, which SimSpace paid and for which Grimsley is not seeking damages. *See* ECF 21-5, at 15, 57:5–22.

Grimsley worked in the role of Vice President of U.S. Federal Sales until February 9, 2024. *See* ECF 23-9, at 36, 134:18–19. Grimsley was the highest compensated employee at SimSpace during his time there. ECF 21-4, at 27, 16–19; ECF 21-2, at 29 ¶ 120; *see also* ECF 23-2, at 16 ¶ 120. Consistent with the 2022 Offer Letter, Grimsley reported to Ross Brewer, the CRO of SimSpace, for the majority of Grimsley's employment, until Brewer was terminated from his position for alleged "poor performance," at which point Hutchison "stepped in to sort of help move the sales team forward." ECF 21-4, at 23–24, at 92:14–93:21. Grimsley described his role at SimSpace at his deposition as one that required him "to engage with the federal government and do business development, identify contracts and bring in revenue from federal organizations into SimSpace." ECF 21-5, at 21, 66:4–9. Grimsley also noted that he was responsible for entering sales opportunities into Salesforce throughout his employment. ECF 21-5, at 41, 146:5–13.

> 2. The FY24 Compensation Plan

Around November of 2022, SimSpace leadership began discussing a reorganization of the Company's compensation structure, specifically by implementing an annual sales compensation plan that would be uniform across all employees who opted for incentive-based earnings. *See* ECF 21-15. SimSpace's updated compensation plan included a new commission arrangement for all employees who opted in, along with corresponding letters containing each individual employee's commission rate, quota, and other specific metrics. *See id.* at 3–6. Hutchison, Gerber, and Brewer were all involved with the drafting process regarding the FY24 Compensation plan to some extent, along with Marci Niles, SimSpace's Vice President of Human Resources, and Carolyn Topham, SimSpace's Vice President of Sales Operations. ECF 21-4, at 7, 24:4–20, at 11, 40:19–21; *see also* ECF 21-15. In emails between those individuals, Hutchison recommended that there should be "no more commissions to those who have not contributed to sale" and "proportional commission based on value added to a sale." ECF 21-15, at 6. Gorman further recommended that

"for Grim, we need to put a comp plan in place that runs from ~Nov through 2023; should follow the policy and template we use for everyone else." *Id.* at 3.

The final FY24 Plan spanned nine pages, and was signed by Brewer, Gerber, and Hutchison at the bottom. *See* ECF 21-20, at 2–10. The FY24 Plan described itself as meant "to achieve certain financial and non-financial goals, including driving significant growth, increasing SimSpace's market share, and ensuring SimSpace is a professional and efficient business partner and customer-focused company." *Id.* at 2. Section I of the FY24 Plan set its effect date as "February 1, 2023" and made itself applicable "to all sales compensation earned on or after February 1, 2023 through January 31, 2024 (the 2024 Fiscal Year), or until any earlier date on which it is terminated by SimSpace (the 'Plan Period')." *Id.* Section I also provided that "[t]he Plan and the Sales Compensation Plan Acknowledgment Letter . . . signed by the Participant . . . contain[s] the entire agreement between the Participant and SimSpace concerning the Participant's 2024 Fiscal Year sales compensation and supersede all prior sales compensation plans/programs of SimSpace and any other oral or written statements to the Participant regarding this subject." *Id.* Finally, Section I provided that SimSpace was "the sole administrator of this plan and may, at its sole discretion, prospectively change this Plan, implement a new plan, eliminate this or any future plan at any time." *Id.*

Section III, titled "Compensation," identified a "base salary," "commissions," and "special incentive" as eligible forms of compensation participants might receive under the FY24 Plan. *Id.* at 2–3. Section IV of the FY24 Plan included defined terms, such as ACV, or "the value of a sales contract that is billable in the first 12 months" to a client, which could be computed at SimSpace's "sole discretion"; the sales "quota" as detailed in the FY24 Letter; the base commission rate ("BCR") paid on "any [q]uota attainment up to 100% and/or as detailed" in the FY24 Letter; and

"quota credit" as "the amount of ACV on a Transaction closed by a Participant credited towards the Participant's Quota." *Id.* at 3–5. Section V described the conditions for obtaining quota credit, including that a transaction for which the credit is sought was "complete," based on, among other necessary conditions, whether "[t]he opportunity associated with the Customer was listed by the Participant in Salesforce." *Id.* at 5–6. Section VI further restricted the quota credit in certain circumstances, including precluding it for "second year onwards ACV on a multi-year deal." *Id.* at 6.

Section VIII of the FY24 Plan dealt specifically with the "earning and payment of commissions and special incentives." *Id.* (capitalization altered). On the topic of commissions, Section VIII provided in relevant part:

> Commissions become *earned* on a Transaction when SimSpace is paid in full by the Customer or Partner, as applicable. . . . Commissions . . . are due and payable after calculation of amounts due and approval of final compensation values by both the CRO and CFO (or designated CFO representative), considering Adjustments, Participant Letters and relevant Sections of this Plan. Payments will be made in accordance with each Participant's Letter.

> Commission . . . amounts paid prior to being earned will be deemed a recoverable draw / advancement. In the event the Transaction is not paid in full by the Customer or is subject to other provisions and/or Adjustments that would reduce the Commission . . . earned amount, the Commission . . . is recoverable from the Participant at any time, including post-employment, through a reduction in future Commissions . . . payments or out of any other moneys due to the employee or any means at the Company's sole election to the extent permitted by applicable law. By receiving payments under this Plan and signing the Participant Letter, Participant agrees to sign any documentation required by the Company's payroll provider to accomplish the same.

> All calculated amounts and the basis for the Commission . . . will be provided to each Participant in a Compensation Statement, signed by the CRO and the CFO (or designated CFO representative).

*Id.* (emphasis in original).

Section IX of the FY24 Agreement governed "participant letter changes." *Id.* at 7 (capitalization altered). It provided that SimSpace "retains the right to edit the Participant Letters,

including enlarging, decreasing, modifying, or changing a Participant's Territory, Quota, BCR, ACRs, or position, at any time in its sole discretion, and to the maximum extent possible will provide prior verbal, written or email notice to the affected Participant." *Id.* However, it specified that "[a]ny such change [was] *prospective*" and would "not affect any Commissions . . . earned on or before the effective date of such change." *Id.* (emphasis added). Section X of the FY24 Plan governed "splits," or the circumstance in which "one or more Participants collaborate on a sale." *Id.* In such a case, quota credit could be split between the participants "based on the level of each Participant's involvement and effort in generating the sale as determined by sales management in its sole discretion." *Id.*

Section XI governed what the parties have termed the "Exceptional Deals" clause. *See id.* That section provided, first, that "all Participants are required to accurately, fully, and timely enter prospective sales opportunities in Salesforce.com" and that such opportunities "must be accurately entered and maintained in Salesforce.com over the life of the opportunity," including the anticipated closing date. *Id.* Second, the clause provided, in relevant part, that in the event an opportunity or transaction was "not properly forecasted" on Salesforce, or "if any of the following situations occur, SimSpace management will review the Transaction, and may determine, in its discretion and without prior notice, to modify, limit, reduce, or eliminate the affected Participant's Quota Credit or Special Incentive on the Transaction: . . . B. Transaction ACV is >40% of Participant's Quota" and "C. Transaction ACV is greater than $1 Million." *Id.* In the event of termination of employment, Section XIV provided that a participant in the FY24 Plan would "cease to earn any compensation under this Plan on the date the Participant is no longer actively employed in good standing with the Company." *Id.* at 8. The FY24 Plan further provided that "good standing means that the Participant is actively employed by the Company, the Company has

not provided the Participant with a notice of termination, and Participant has not provided the Company with a notice of termination." *Id.* However, the participant would "be paid any *earned* Commissions and/or Special Incentives in conjunction with the Participant's final payroll event (subject to local laws)." *Id.* (emphasis added).

Section XVIII provided that the FY24 Plan "does not create a contract of employment for any specified period of time between SimSpace and any Participant. In addition, payment(s) made in any year is no guarantee of payment(s) in future years." *Id.* at 9. Moreover, in Section XIX, SimSpace again "reserve[d] the right to modify, amend, suspend, and/or terminate this Plan at any time" and noted that it "may, at its sole discretion, provide affected Participants with prior written or email notice of that amendment, modification, suspension, or termination." *Id.* The FY24 Plan also contained its own choice of law clause, which indicated that, "[f]or U.S. based Participants, this Plan shall be governed by and construed in accordance with the laws of the State in which the eligible Participant resides." *Id.* The final section of the FY24 Plan that is potentially relevant to this litigation, Section XXII, stated that "[b]y signing the Participant's Letter, each Participant acknowledges that the Participant has read, understands, and agrees to the terms and conditions of this Plan as referred to in their letter." *Id.* Further, "[t]he Plan and the Letter set forth the entire agreement and understanding between SimSpace and the Participant relating to the Participant's sales compensation, and those documents supersede and replace any and all prior plans, agreements, discussions and understandings, whether oral or written, regarding the Participant's sales compensation." *Id.* at 9–10.

### 3.  Grimsley's FY24 Letter

Gorman stated at his deposition that SimSpace management "created the plan . . . and had that executed. Then, as individual reps came to terms on their individual letters, we attached the plan with the letter, sent the entire package to them to review and sign their letter, the letter

acknowledging that they had read the entire plan that was in place, and acknowledge the terms of their individual letters." ECF 21-18, at 24–25, at 128:18–129:7. Grimsley's Sales Compensation Plan Acknowledgement Letter (the "FY24 Letter") stated that Grimsley's "base earnings" was $280,000, his quota for "new and upsell US federal customer transactions" was $2 million and his BCR was 15.5%. *See* ECF 21-20, at 11 (capitalization altered). The FY24 Letter noted that there were "no provisions for renewal Customers" or "US Government Assisted Transactions," and that "[a]t the sole discretion of the CRO and CFO, Quota Credit may be given and Commissions paid for Transactions booked outside of the Territory, provided it can be shown in Salesforce.com that Participant was directly involved." *Id.* Like the FY24 Plan, the FY24 Letter also provided that there would be no quota credit given "for second year onwards ACV on multi-year deals," but did provide that there would be a "bonus at the 'Multi-Year Rate' (limited to the second and third years of contract only)" in the amount of 1.9375%. *Id.*

In the FY24 Letter's "other terms and conditions" section, it provided that "Quota Credit is awarded by the CRO and CFO . . . as defined in the Plan" and commissions were to be paid on a quarterly basis, "no later than the last pay period of the second month following the end of the quarter (end of June for Q1, end of September for Q2, end of December for Q3, and end of March for Q4)" so long as the participant was "actively employed in good standing by SimSpace when a Commission is accrued." *Id.* at 12. That section further provided that in the case of "[a]ny conflict between the terms of this Letter and the Plan, the Plan shall govern." *Id.* Finally, it reiterated that "SimSpace reserves the right to modify, amend, suspend, and/or terminate the terms of this Letter at any time" and "[t]o the maximum extent possible, SimSpace will provide the Participant with prior verbal, written or email notice of that amendment, modification, suspension, or termination." *Id.* Above the signature line, the FY24 Letter stated: "Your signature below attests that you have

read and accepted the terms of this Letter and the 2024 Fiscal Year SimSpace Sales Compensation Plan." *Id.*

### 4.    Grimsley's Execution of the FY24 Compensation Letter

In early February of 2023, Brewer contacted Grimsley about changing his compensation structure in Fiscal Year 2024. *See* ECF 21-21. He noted that "[t]he intent [was] to get all the sales team on the same FY24 compensation plan, based on revenue attainment." *Id.* at 2. Brewer noted that "[w]e will of course honour any arrangement you have with [Hutchison] and it's up to you how you want to proceed and if you want to move over to the new plan at this stage." *Id.* Brewer also noted that SimSpace management was "trying to find the best way to compensate you on PCTE, while driving new Gov US business." *Id.* Based on Brewer's email, the FY24 Letter would have originally included a quota of $4 million for Grimsley, along with, among other things, "0-100% of commission in direct line with annual quote [sic] i.e., $4,000,000 / $310,000 = 7.75% Base Commission Rate." *Id.* at 3. Brewer stated it differently: "[f]or every dollar of ACV you sell you sell you will receive $0.0775 up to 100% of your quota." *Id.* Originally, Grimsley responded that he preferred "to stick with [his] original plan." *Id.* at 4.

On March 2, 2023, after an apparent call with Grimsley, Gorman sent an email reiterating "our intent to honor any agreements made between you and [Hutchison] regarding your compensation." ECF 21-22, at 2. Gorman went on to propose some thoughts about "possible provisions" of the FY24 Letter, including maintaining Grimsley's $280,000 base salary, a quota of $2 million, and a BCR of either 16% or 12%, among other provisions. *Id.* Grimsley responded on March 6, 2023 with a proposal for, in relevant part, a quota of $2 million, which "includes upsell of existing contracts but does not include PCTE renewal of $21.4M," and:

o   Quota from $2,000,000-$4,000,000 = 0% Commission

o   Quota from $4,000,000+ = 7% Commission

*Id.* at 3.  The next day, Gorman responded that he would take a closer look and follow up.  *Id.*  In a conversation over Slack with Roland Hansen, another sales engineer on Grimsley's team, on March 16, 2023, Hansen told Grimsley that Hansen still did not know what Hansen's quota would be for FY24.  ECF 21-23, at 3.  Grimsley responded that it was "probably because I've been a pain in the a-- and I'm delaying everyone else."  *Id.*  Grimsley later wrote that he had "heard [Hansen's] quota would be 4 through the grapevine."  *Id.*  Hansen asked, "New and renewals?"  *Id.*  Grimsley responded, "That's what [sic] I'm fighting a bit because it was no renewals… only upsells and Michelle would be responsible for all renewals."[8]  *Id.* at 4.

On April 25, 2023, Grimsley signed a FY24 Letter that included comments from him in Word format.[9]  *See* ECF 21-24; ECF 23-7, at 2–5.  The comments identified Grimsley's issues with two of the FY24 Letter's provisions.  *See* ECF 23-7, at 4.  First, Grimsley commented on Section 7 of the FY24 Letter related to U.S. Government Assisted Transactions, writing:

> This is a no go for me. My plan from the beginning was to land and expand with PCTE. Quickest way to increase revenue was through existing contracts. When I first read this I thought there was a PCTE clause but there is not. So if PCTE increases capacity or upsells do I get credit for that? I was told no by Ross. I explained that more than 25% of my time is spent on PCTE between Sprints travel and events. It's evident with the preparing of the relationship. His comment was that I would get the benefit of all of the transactions that would come from PCTE... i.e the UK MOD. I'm working closely with the CYBERCOM J9 and the OSD SCO to push government initiatives. Originally I would get all the PCTE expansion and there wasn't any provisions.

---

[8] As Grimsley explained at his deposition, SimSpace treated renewals as the "responsibility of the customer success person."  ECF 23-9, at 28, 103:11–12.  Grimsley described it as follows: "I sell a new deal. I hand it off to client success or customer success, and they have the care and feeding of that client."  *Id.* at 103:12–16.

[9] Although Grimsley did not execute the FY24 Letter until May, he agrees that the FY24 Letter "would apply to February forward."  ECF 21-5, at 25, 91:5–14.

*Id.* (errors in original). A member of SimSpace management believed to be Gorman replied to Grimsley's comment, *see* ECF 23-4, at 9, 28:6–17; ECF 23-8, at 8, 22:1–3, writing:

> This is FMS (where the USGov pays for another country's capability). This is not PCTE-sourced or Allied Gov that pay for their own capability. Need to reconcile with Territory also...

ECF 23-7, at 2. Second, Grimsley commented on Section 8 of the FY24 Letter, which stated that there were "no provisions for renewal Customers." *Id.* Grimsley wrote:

> My second question on renewals. For example. DOE is purchasing a range for let's call 1M. Next year they purchase a range for 1.5M. Do I get credit for 1.5M for only 500K? I don't get this either. I understand if it was someone else customer that was renewing but if it is a customer that I brought in and have the relationship with then why would I not get commission. So I cut ties all together and move on?

*Id.* A SimSpace representative, again likely Gorman, responded, writing:

> This is for FY24 only. There will be a new comp plan for FY25. As far as I am aware, you do not have any renewals in FY24... Customer Success owns all renewals for the FY.

*See id.*

The record contains a copy of the FY24 Plan with Grimsley's signed FY24 Letter appended thereto, without comments and dated April 25, 2023. *See* ECF 21-25, at 14. On that document, Brewer's signature is dated "5/17/2023." *Id.* On April 27, 2023, in an email from Brewer to Gorman, Brewer expressed his concern that Grimsley would have a "big reaction to the main comp plan as it's very heavy handed." ECF 23-11, at 3. Brewer noted that Gorman should "issue he [sic] complete package via DocuSign and then we can deal with his reaction." *Id.* The DocuSign records produced should that the FY24 Plan and Letter document package was created by Gorman in DocuSign on April 29, 2023, and Gorman sent invitations to access that document package to Brewer and Grimsley on that same day. *See* ECF 21-26, at 2. DocuSign records reflect that Grimsley opened and viewed the document package that evening, and again on May 1, 2023, but

DocuSign records never indicate Grimsley "signed" the document package, *see id.* at 2–3, like they do for Brewer, presumably because the FY24 Letter appended to the FY24 Plan had already been signed by Grimsley on April 25, 2023.

On April 29, 2023, Gorman sent an email to Brewer that stated, "He signed it. I don't know if he even read the front matter. I'm going to turn into a pdf and re-send for signatures to make sure it is clean." ECF 23-11, at 3. On May 1, 2023, Brewer responded, "Agreed." ECF 23-11, at 4. The final two entries in the DocuSign records associated with the document package note that it was resent to Grimsley by Gorman on May 12, 2023 and that the document package was "voided" on May 15, 2023. *Id.* at 3. On May 17, 2023, the DocuSign system sent Gorman a notification that Grimsley's FY24 Letter had "been completed." ECF 21-25, at 2 ("All signers completed"). However, Gorman understood this to mean, and DocuSign records reflected, that Brewer had signed the document package, not Grimsley. ECF 23-8, at 13, 42:1–10; *see also id.* at 34, 126:4–10 ("[Grimsley] did not execute a DocuSign on the full plan and letter.").

Gorman noted at his deposition that his "intent for sending [ ] Grimsley that entire package was he had only sent me his letter signed. I put the two together to follow the same process we used with all of the other reps and sent them to him. He viewed it and opened it two times." ECF 21-18, at 25, 129:8–13. Gorman apparently "wanted to give [ ] Grimsley the opportunity to actually read the entire document before formally signing again." ECF 23-8, at 10, 30:6–13. However, as Gorman observed, Grimsley "did not ever sign" the entire package of materials anew. *See* ECF 21-18, at 25, 129:14–15; ECF 23-8, at 13, 45:6–19.

5.    Grimsley's Termination from SimSpace

In January of 2024, SimSpace decided to terminate Grimsley's employment, although Hutchison stated at his deposition that it had been discussed "for a while."[10]  ECF 21-4, at 19, 71:7–11; *see also* ECF 21-47.  Hutchison had discussed Grimsley's potential termination with Niles, as well as potentially with Gorman and Brewer.  ECF 21-4, at 19, 71:2–6, 71:12–14. Hutchison described the reason for Grimsley's termination as "lack of progress on developing the sales pipeline" in sustainable fashion, "lack of progress in bringing in new sales deals," and lack of impetus and initiative required for his role.  ECF 21-4, at 20, 72:10–14.

Hutchison informed Grimsley of SimSpace's decision to terminate his employment in a meeting on January 30, 2024, after which he was provided written confirmation that he would be placed on administrative leave, effective immediately, and his termination of "employment with SimSpace" would be effective on February 9, 2024.  *See* ECF 21-48, at 2–4.  Grimsley was also presented with a written separation agreement and release.  *See* ECF 21-49; ECF 21-5, at 36, 135:12–19.  The agreement identified that Grimsley had "earned the commission payment of $155,000 for the Florida Cyber Range SaaS deal which will be paid to you as per your FY2024 sales commission plan."  ECF 23-9, at 37, 138:1–7.  The agreement also noted that commission payments for the IARPA deals referenced in Grimsley's complaint would be paid if those deals were "completed on or before February 9, 2024," the date of Grimsley's termination.  *See* ECF 23-9, at 37, 138:15–139:9.  Grimsley did not agree to the separation agreement.  *See* ECF 23-9, at 37, 140:5–7.

_____

[10] Hutchison stated that he had conversations in the "spring of 2023 . . . that things were not moving in an appropriate direction."  ECF 21-4, at 21, 90:5–9.  Specifically, Hutchison had spoken to Grimsley about a "lack of drive" and "lack of initiative" on the Cyber Florida deal.  *Id.* at 21–22, 90:12–91:4, at 22, 91:17–20.

After his termination, Grimsley informed Legg of Grimsley's intention to pursue litigation against SimSpace to recover commissions for a number of deals. *See* ECF 21-56; ECF 21-57. Grimsley stated over text that he was "going to try to claim everything" in the hope that "1 or 2 will hit[,]" and mused about getting "a couple mil [in] settlement." ECF 21-56, at 2; ECF 21-57, at 2. Grimsley also created an excel spreadsheet with a number of deals prepared in anticipation of this litigation. *See* ECF 21-52, at 2.

### 6.    The Contested Deals

Grimsley's complaint identifies seven deals he believes he earned commissions on during his tenure at SimSpace. *See* ECF 2, at 5–7. Grimsley asserts that he was only "properly compensated" for one of those deals during his time at SimSpace—"MCTOE[A]"—for which he received a commission of $2,325.00. *Id.* at ¶ 34. Grimsley thus alleges Defendants underpaid his commission "by an amount in excess of $340,000." *Id.* at ¶ 36. Grimsley has not identified any additional deals on which he believes he is owed commissions. *See* ECF 23-1, at 2. The Court will address facts related to each deal at issue below as it becomes relevant to do so.

### B.    Procedural History

On September 9, 2024, Grimsley filed this lawsuit in the Circuit Court for Anne Arundel County. *See* ECF 1-1; ECF 2. On October 7, 2024, Defendants removed the action to this Court on the basis of diversity jurisdiction. *See* ECF 1. On October 14, 2024, Defendants filed their answer, ECF 4, and a day later this Court issued a scheduling order, ECF 5. On May 2, 2025, the parties filed a joint status report indicating that discovery had been completed, ECF 15, and on June 5, 2025, Defendants filed the motion for summary judgment now ripe for resolution, ECF 21.

## II.    <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.   <u>ANALYSIS</u>

Defendants make distinct arguments regarding why summary judgment is warranted as to Hutchison and SimSpace, respectively.  The Court addresses the arguments with respect to each Defendant in turn.

### A.     **Hutchison**

With respect to Hutchison, Defendants argue that although Grimsley's complaint alleged that Hutchison was his "employer" under the MWPCL, "discovery did not remotely bear out these allegations."  ECF 21-2, at 34.  Grimsley argues that, "[w]hen viewed in the light most favorable to [ ] Grimsley, the evidence supports a finding that [ ] Hutchinson [sic] was [ ] Grimsley's 'employer' within the meaning of the MWPCL."  ECF 23-1, at 23.  Defendants have the better argument, and the Court will dismiss Hutchison as a defendant in this action.

"The MWPCL is a statutory cause of action, the purpose of which is 'to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages.'"  *Roley v. Nat'l Pro. Exch., Inc.*, 474 F. Supp. 708, 718 (D. Md. 2020) (quoting *Cunningham v. Feinberg*, 107 A.3d 1194, 1202 (Md. 2015)), *aff'd*, 860 F. App'x 264 (4th Cir. 2021).  On termination of employment, the MWPCL provides that "each employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the

employee would have been paid the wages if the employment had not been terminated."  Md. Code Ann., Lab. & Empl. ("LE") § 3-505(a).  The act defines "employer" as "any person who employs an individual in the State or a successor of the person."  *Id.* § 3-501(b).  The parties dispute whether Hutchison meets that definition.[11]

"[T]he MWPCL does not contain a provision that expands employer liability to those acting on behalf of the employer."  *Caseres v. S&R Mgmt. Co., LLC*, No. 12-CV-01358-AW, 2012 WL 5250561, at \*4 (D. Md. Oct. 24, 2012) (citing *Watkins v. Brown*, 173 F. Supp. 2d 409, 416 (D. Md. 2001)).  Accordingly, "[c]ourts analyzing the MWPCL have rejected any interpretation that would encompass supervisors, officers, or other agents acting on behalf of the corporate employer."  *Id.* (first citing *Watkins*, 173 F. Supp. 2d at 416; and then citing *Hosack v. Utopian Wireless Corp.*, Civ. No. DKC-11-0420, 2011 WL 1743297, at \*5 (D. Md. May 6, 2011)); *see also Cartwright v. Contour Mortage Corp.*, Civ. No. RDB-23-1964, 2024 WL 3454997, at \*3 (D. Md. July 17, 2024) ("Supervisors and officers are not automatically classified as employees under the MWPCL.").

To determine whether an individual can be a considered an "employer" under the MWPCL's definition and thus jointly liable for MWPCL violations, "Maryland courts use the 'economic reality' test."  *Roley*, 474 F. Supp. 3d at 722 (citation omitted).  "Specifically, courts consider whether the employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records."  *Id.* (first citing *Newell v. Runnels*,

---

[11] It is no bar to Grimsley's potential recovery from Hutchison that SimSpace is an employer for purposes of the MWPCL.  "[E]mployees can have multiple employers for MWPCL purposes." *Roley*, 474 F. Supp. 3d at 722 (citing *Pinnacle Grp., LLC v. Kelly*, 178 A.3d 581, 604–05 (Md. App. 2018), as an example).

967 A.2d 729, 772 (Md. 2009); and then citing *Campusano v. Lusitano Const., LLC*, 56 A.3d 303, 308 (Md. App. 2012)); *see also Swain v. Paramount Glob. Inc.*, Civ. No. SAG-24-00458, 2024 WL 3555114, at *5 (D. Md. July 25, 2024).

"The four enunciated factors of 'control' are not to be applied mechanistically[.]" *Campusano*, 56 A.3d at 309. "[I]t is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer." *Id.* (quoting *Baystate Alt. Staffing v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998)). "Consideration of these four factors is aimed at assessing the broader question of whether the putative employer played a role in 'causing' the underpayment of the employee and the decision to prioritize other financial obligations." *Roley*, 474 F. Supp. 3d at 722 (citing *Campusano*, 56 A.3d at 310). In light of that purpose, Maryland courts also sometimes consider "whether the putative employer had 'operational control over significant aspects of the business' and an 'ownership interest in the business.'" *Id.* (quoting the same). "In applying the economic reality test, courts assess specifically the putative employer's relationship with the plaintiff-employee in particular." *Id.* (citing *Auto. Trade Ass'n of Md. v. Harold Folk Enters., Inc.*, 484 A.2d 612, 621 (Md. 1984)).

The Court first assesses whether Hutchison had the "power to hire and fire the employees." *Roley*, 474 F. Supp. 3d at 722. It is clear that Hutchison played a significant role in recruiting Grimsley to SimSpace, *see, e.g.*, ECF 21-7; ECF 21-8; ECF 21-9, and in observing and eventually communicating the reasons for Grimsley's ultimate termination, *see, e.g.*, ECF 21-47. However, Grimsley points to no evidence in the record probative of a conclusion that Hutchison had any "unilateral authority to hire and fire" Grimsley. *Roley*, 474 F. Supp. 3d at 724. Rather, the record reflects that Hutchison was Grimsley's point of contact in negotiating an offer of employment with SimSpace. *See, e.g.*, ECF 21-7; ECF 21-8; ECF 21-9. The 2022 Offer Letter explicitly stated that

Hutchison was acting "[o]n behalf of the SimSpace Corporation" and that Grimsley was being offered "employment with the Company."  ECF 21-13, at 2.  *Cf. Odjaghian v. HHS Tech. Grp., LLC*, 848 F. App'x 534, 541 (4th Cir. 2021) ("Reading Appellants' allegations in the light most favorable to them, as we are required to do, clearly shows that EngagePoint employed Appellants and that White acted on behalf of EngagePoint.").  Further, although Hutchison informed Grimsley of his termination, Grimsley's separation agreement and release came from Niles, SimSpace's Vice President of Human Resources at the time.  *See* ECF 21-49; ECF 21-5, at 36, 135:12–19.  Although Hutchison clearly "exercised some control" over the matter of Grimsley's employment, Grimsley fails to invoke evidence that Hutchison was acting pursuant to "unilateral" power, rather than on behalf of SimSpace management.  *See Roley*, 474 F. Supp. 3d at 724.

The Court next turns to whether Hutchison "supervised and controlled" Grimsley's "work schedules or conditions of employment."  *Roley*, 474 F. Supp. 3d at 722.  Grimsley's 2022 Offer Letter indicates that Grimsley would be "reporting to the CRO," who was Brewer at the time, not Hutchison.  *See* ECF 21-13, at 2.  Indeed, Gerber, the CFO, and Brewer were the individuals who signed Grimsley's commission payment for the MCOTEA deal.  *See* ECF 21-29, at 2.  Moreover, multiple members of SimSpace management were involved in establishing the initial terms of Grimsley's employment, to varying degrees.  *See, e.g.*, ECF 21-10, at 3.  And, to the extent that the terms of FY24 Plan and Letter later governed Grimsley's employment, Hutchison testified that he had "very little, if any" involvement in the drafting or signing of Grimsley's FY24 Letter.  *See* ECF 21-4, at 18, 62:17–21.  Moreover, in his declaration, Hutchison noted that "[a]s a highly compensated exempt employee, [ ] Grimsley had the flexibility to set his own work schedule.  I did not supervise or control [ ] Grimsley's work schedule, or otherwise dictate the hours he was required to work.  [ ] Grimsley was free to set his own schedule provided that he sufficiently

completed all of his work duties." ECF 21-16, at 2–3 ¶ 6. Grimsley points out that Hutchison gave Grimsley verbal feedback on his work, *see, e.g.*, ECF 21-4, at 20, 72:10–14 ("I felt like I had to push or prompt him more than what would have normally been required."), and that Hutchison "stepped in to sort of help move the sales team forward," once Brewer was terminated, ECF 21-4, at 23–24, at 92:14–93:21. Grimsley states that at that point, Hutchison became his "direct supervisor." ECF 23-5, at 3 ¶ 4. Even taking Grimsley's account as true, Hutchison's role as Grimsley's direct supervisor does not transform Hutchison into the person who "controlled" Grimsley's working conditions at SimSpace, especially in light of the other undisputed assertions that Grimsley had significant discretion over his daily schedule and was supervised by the CRO for a significant portion of his tenure at SimSpace.

Neither can Grimsley show that Hutchison "determined the rate and method of [Grimsley's] payment." *Roley*, 474 F. Supp. 3d at 722. Hutchison was not the only actor involved in setting Grimsley's compensation prior to Grimsley joining SimSpace. Rather, Hutchison was aided by other members of SimSpace management in reviewing and finalizing the terms of the offer letter. *See* ECF 21-10; ECF 23-4, at 26, 97:12–17. In fact, after Gerber expressed concern about Hutchison's original base commission rate proposal for Grimsley, Hutchison's follow-up communications changed to reflect a lower rate. *See* ECF 21-10, at 2; ECF 21-11, at 3. And although Grimsley accurately observes that Hutchison "recruited [him] to join SimSpace" and "negotiated [his] compensation package directly," ECF 23-5, at 3 ¶ 4, Grimsley does not point to anything in the record, beyond his own declaration, suggesting Hutchison exercised exclusive control over those decisions. *See* ECF 23-5, at 3 ¶ 4 (stating that Hutchison was the person who ultimately refused to pay the commissions"). To the contrary and as discussed, Hutchison was not

even a signatory on the commission payment made from SimSpace to Grimsley for the MCOTEA deal. *See* ECF 21-29, at 2.

Finally, nothing in the record indicates that Hutchison maintained employment records for Grimsley during Grimsley's employment with SimSpace. To the contrary, Hutchison's declaration states that "[a]s CEO, [he] did not maintain any employment records for any SimSpace employees." ECF 21-16, at 3. Rather, "Grimsley's personnel records, like those of other SimSpace employees, were maintained by SimSpace's Human Resources ("HR") Department in the regular course of SimSpace's business, and his payroll records were maintained by SimSpace's Payroll Department." *Id.* Grimsley has not identified any employment records produced in discovery that are Hutchison's records, as opposed to SimSpace's. To the extent the additional factors of ownership interest and operational control are relevant to applying the economic reality test in this case, the Court observes that Hutchison does not hold a majority interest in SimSpace, as he owns 18% of SimSpace's shares. *See* ECF 21-4, at 4, 7:1–8. While Hutchison certainly had some operational control over significant aspects of SimSpace as its then-CEO, that level of control was "tempered" by the role other members of SimSpace management played in Grimsley's employment and work. *See* Roley, 474 F. Supp. 3d at 724.

Grimsley argues that the fact "that other employees played a role in some of these activities is not sufficient to overcome the evidence that [Hutchison] was [ ] Grimsley's 'employer' under the statute." ECF 23-1, at 24. The primary case Grimsley invokes in support of that proposition is *Pinnacle Group, LLC v. Kelly*, 178 A.3d 581 (Md. App. 2018). However, *Pinnacle Group* is readily distinguishable. There, the Appellate Court of Maryland found no error in a trial court's "application of the four–factor economic reality test" and conclusion that the sole owner, D'Antonio, was the plaintiff's employer under the MWPCL. *Id.* at 604. In so holding, the

25

appellate court noted that D'Antonio's "position as sole owner of Pinnacle [did] not alone subject him to personal liability under the MWPCL." *Id.* However, D'Antonio had stated in his answer to interrogatories that he was "the only person" at the company "with the authority to 'official hire' or 'officially fire'" employees. *Id.* He similarly reported that he had "the final say regarding employees' work schedules" and had "final authority to oversee the *daily* operations" of the company. *Id.* (emphasis added). Moreover, D'Antonio stated at his deposition that he approved a summary of each employee's hours before the payroll process was finalized and was responsible for approving all salary and pay raises of employees. *See id.* Further, the *Pinnacle Group* Court held that D'Antonio's near-exclusive control over those decisions was not lessened by the fact that he had "two employees 'who are responsible for bookkeeping, payroll, scheduling employees, and administering other personnel related duties.'" *Id.* Accordingly, D'Antonio was "jointly and severally liable" under the MWPCL for the wages due to the plaintiff in that case. *Id.* at 605. Hutchison, however, has not made statements reflecting that he has the extent of control D'Antonio exercised in *Pinnacle Group*, nor does Grimsley point to any such statements in the record.

The Fourth Circuit's unreported decision in *Odjaghian v. HHS Technology Group, LLC*, is more on point. 848 F. App'x 534 (4th Cir. 2021). There, the court considered whether plaintiffs, two former executives at a healthcare technology company, had stated a plausible claim that their former CEO was their "employer" under the MWPCL. *See id.* at 536, 540. The Fourth Circuit did not ultimately engage with the economic reality factors at great length, because it observed that the MWPCL's definition of "employer" "contemplates some sort of contractual relationship *involving the payment of wages in exchange for services*." *Id.* at 540 (emphasis in *Odjaghian*) (quoting *Watkins*, 173 F. Supp. 2d at 414). "The plain language, general purpose[,] and clear intent of the MWPCL do not support an interpretation of the word 'employer' that would

include a mere supervisor of another employee." *Id.* (quoting *Watkins*, 173 F. Supp. 2d at 415–16). Applying that principle to the allegations before it, the *Odjaghian* Court reasoned that the allegation that the CEO was an employee of the healthcare technology company at the same time as plaintiffs and had "informed [them] that their employment was terminated" was insufficient as a matter of law to plausibly allege that the CEO was their "employer" under the MWPCL, particularly where other allegations in the complaint made it clear that the CEO "acted on behalf of" the company. *Id.* at 541. Grimsley points to no evidence on this record to generate a genuine dispute of material fact about whether he maintained the kind of "contractual relationship involving the payment of wages in exchange for services" with Hutchison directly, rather than SimSpace, that is necessary under the MWPCL to give rise to Hutchinson's liability. *See id.* at 540 (citation omitted).

As Judge Gallagher recently noted, "[w]hile not determinative, . . . typically, individual defendants are deemed 'employers' in the context of small companies where the individual owners are directly running the business and making all employee-related decisions, and where the company itself may be undercapitalized." *Swain*, 2024 WL 3555114, at *5. Even construing the minor disputes of fact as to Grimsley and Hutchison's relationship in the light most favorable to Grimsley, the record demonstrates that Hutchison was not an "employer" under the MWPCL and the Court will grant summary judgment to Hutchison on Grimsley's MWPCL claim.

### B.    SimSpace

Grimsley alleges that SimSpace violated the MWPCL by failing to pay him commission for several deals. *See* ECF 2, at 7. SimSpace argues that it is entitled to summary judgment primarily because the FY24 Letter Grimsley signed and the FY24 Plan referenced therein gave SimSpace the right to modify, amend, or eliminate the amount of commissions or incentive payments paid to its employees. *See* ECF 21-2, at 9. Grimsley counters that the 2024 Fiscal Year

Sales Compensation Plan and letter "was never properly disclosed to [ ] Grimsley and is not enforceable." ECF 23-1, at 5. Grimsley claims that he signed the Compensation Letter prior to being provided with the FY24 Plan, which he contends "contains onerous terms that were never negotiated with" Grimsley, including the Exceptional Deals clause. ECF 23-1, at 12–13. Further, Grimsley argues that "[t]he summary judgment record contains ample evidence from which a reasonable factfinder could conclude that [ ] Grimsley earned the disputed commissions and that Defendants' failure to pay him violated the MWPCL." *Id.* "At a minimum," he argues, "genuine disputes of material fact exist as to the formation, disclosure, and enforceability of the purported compensation plan as well as Defendants' basis for withholding" the commissions. *Id.*

The Court first addresses whether Grimsley was entitled to any commissions as "wages" under the MWPCL, which turns on what terms governed Grimsley's compensation while he worked at SimSpace. The Court then addresses whether SimSpace paid Grimsley wages in accordance with the terms of his employment.

### 1. Whether the Commissions were Wages under the MWPCL

The MWPCL requires that "[e]ach employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." LE § 3-505(a). In applying § 3-505, courts consider (1) whether the disputed amount constitutes a wage, and (2) if so, whether it is owed to the employee as "wages due." *Medex v. McCabe*, 811 A.2d 297, 303 (Md. 2002). The MWPCL defines "wage" as "all compensation that is due to an employee for employment," including "a commission." LE § 3-501(c)(1)–(2); *see also Macsherry v. Sparrows Point, LLC*, 973 F.3d 212, 226 n.9 (4th Cir. 2020); *Medex*, 811 A.2d at 302 ("Commissions are clearly within the scope of the [MWPCL].").

For a commission to count as a "wage," however, "the employee must have been promised the particular form of compensation as remuneration for his labor." *Varghese v. Honeywell Int'l Inc.*, 424 F.3d 411, 418 (4th Cir. 2005); *Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 671–72 (Md. 2001) ("[T]he wages which an employee is due, and which must be paid . . . consist of all compensation, and any other remuneration, that the employee was promised in exchange for his work. In other words . . . to be wages, to be included within the statute, the payment must have been promised to the employee as compensation for work performed." (internal quotation marks omitted)); *Medex*, 811 A.2d at 302 ("We have held that it is the exchange of remuneration for the employee's work that is crucial to the determination that compensation constitutes a wage. Where the payments are dependent on conditions other than the employee's efforts, they lie outside the definition."); *see also Martignetti v. Int'l Bus. Machines Corp.*, 855 F. App'x 857, 860 (4th Cir. 2021). "[A]n employee's right to compensation vests when the employee does everything required to earn the wages." *Medex*, 811 A.2d at 305.

Thus, to decide whether the commissions Grimsley claims he is due are "wages" under the MWCPL, the Court must first determine whether commissions were, in fact, promised to Grimsley. This inquiry turns on the question of what agreement and terms governed Grimsley's employment with SimSpace, more specifically, whether the FY24 Plan controlled. Grimsley argues that "there is a genuine dispute of material fact regarding whether the FY24 Plan constitutes a binding agreement between Defendants and [ ] Grimsley." ECF 23-1, at 25. "Simply put," says Grimsley, he "never signed the FY24 Plan and he never assented to the terms set forth therein." ECF 23-1, at 25. The Court thus begins by examining whether Grimsley bound himself to the terms of the FY24 Plan and Compensation Letter.

*i.    Governing Law*

As an initial matter, neither party appears to dispute that Maryland law applies to this Court's consideration of the contract issues presented by the FY24 Plan and FY24 Letter.  *See* ECF 23-1, at 25–28; ECF 26, at 26–30.  The FY24 Plan, which the FY24 Letter references, includes a choice of law clause that states, "[f]or U.S. based Participants, this Plan shall be governed by and construed in accordance with the laws of the State in which the eligible Participant resides." ECF 21-20, at 9.  And although the parties do not discuss it, the 2022 Offer Letter, to the extent it is relevant to the terms of Grimsley's employment, also contains a choice of law provision, which states that "[t]he terms of this Offer Letter and the resolution of any disputes at to the meaning, effect, performance or validity of this Offer Letter" will be "governed by Massachusetts law." ECF 21-13, at 3.

"Choice of law provisions are not self-executing[.]" *Hetrick Companies LLC v. IINK Corp.*, 710 F. Supp. 3d 467, 482 n.7 (E.D. Va. 2024).  The chosen law governs "only if the choice of law clause itself is valid and enforceable." *Id.*  "Federal courts sitting in diversity apply the law of the state in which the court is located, including the forum state's choice of law rules." *JJK Grp., Inc. v. VW Int'l, Inc.*, Civ. No. TDC-13-3933, 2015 WL 1459841, at *4 (D. Md. Mar. 27, 2015) (citing *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007)).  "Under Maryland law, choice-of-law provisions in contracts are considered generally valid." *Id.* (citing *Jackson v. Pasadena Receivables, Inc.*, 921 A.2d 799, 803 (Md. 2007)).  Thus, the Court will apply Maryland law to matters of contract formation and interpretation regarding the FY24 Plan and FY24 Letter and Massachusetts law to matters of contract formation and interpretation regarding the 2022 Offer Letter.

ii.    *Incorporation by Reference*

"Generally, all writings which are part of the same transaction are interpreted together." 11 Williston on Contracts § 30:25 (4th ed.). "Incorporation by reference is a method of contract drafting such that where a subsequent document references a previous document, it incorporates that previous document into the subsequent." *Pinnacle Grp.*, 178 A.3d at 597. "Maryland law recognizes that parties may agree to define their rights and obligations by reference to documents or rules external to the contract." *Wells v. Chevy Chase Bank, F.S.B.*, 832 A.2d 812, 831 (Md. 2003). "It is settled that where a writing refers to another document that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *Pinnacle Grp., LLC*, 178 A.3d at 597 (quoting *Wells*, 832 A.2d at 831).

The Supreme Court of Maryland recently left unresolved the question of whether, "[w]here a separate document is never made available to, shown to, or signed by a contracting party, but that separate document is incorporated by reference into the underlying contract, [ ] a consumer [is] bound by the terms of that separate document despite the fact that the consumer had no knowledge of or access to the terms contained in that separate document?" *Lyles v. Santander Consumer USA Inc.*, 347 A.3d 449, 455 n.2 (Md. 2025). Although Maryland's highest court has yet to resolve the issue, Maryland's intermediate appellate court has suggested, albeit in an unreported opinion, that Maryland's incorporation by reference doctrine might still be utilized even where parties fail to attach a document to the contract that is referenced in the signed contract. *See Leveque v. Esveld*, No. 2478, Sept. Term, 2017, 2019 WL 3231365, at *3 n.7 (Md. App. July 18, 2019) (citing *Ray v. William G. Eurice & Bros.*, 93 A.2d 272, 274, 279 (Md. 1952), a case in which "plans and specifications were incorporated by reference into contract to build a house where the written contract 'specifically and explicitly' referred to the documents even if they were not physically attached to the contract, though the contract stated the documents were 'attached'");

*see also Lyles v. Santander Consumer USA Inc.*, 325 A.3d 1000, 1013–14 (Md. App. 2024), *rev'd on other grounds*, 347 A.3d 449 (Md. 2025).

The Fourth Circuit has also considered, albeit in a case applying West Virginia law, whether incorporation by reference was proper where a contract contained the statement, "ALL TERMS & CONDITIONS ON THE FOLLOWING PAGES ARE INTO [sic] AND MADE A PART OF THIS CONTRACT," but in fact no "following pages" were attached to the document. *Logan & Kanawha Coal Co., LLC v. Detherage Coal Sales, LLC*, 514 F. App'x 365, 366 (4th Cir. 2013). In *Logan*, the Fourth Circuit observed that although the Supreme Court of Appeals of West Virginia had recognized that separate writings may be incorporated by reference into a contract, it had not articulated the requirements for effective incorporation by reference. *Id.* at 367. Drawing on Third Circuit precedent and *Williston on Contracts*, the *Logan* Court concluded that the doctrine of incorporation by reference had been satisfied by the reference in the contract to the terms and conditions, despite the failure to attach such terms. *See id.* at 367–68. The Fourth Circuit observed that "[i]ncorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship." *Id.* (quoting *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 447 (3d Cir. 2003)). "Although it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms, the party challenging incorporation need not have actually received the incorporated terms in order to be bound by them, especially when both parties are sophisticated business entities." *Id.* at 368 (internal citation omitted) (first citing 11 Williston on Contracts § 30:25 (4th ed. 2011); and then citing *Standard Bent Glass*, 333 F.3d at 447 n.10).

32

The Fourth Circuit's reasoning in *Logan* is consistent with other firmly recognized principles of Maryland contract law. Indeed, Grimsley agrees that "a party challenging the incorporation of a document 'need not have actually received the incorporated terms in order to be bound by them'" at the time of assent. *See* ECF 23-1, at 26 (quoting 11 Williston on Contracts § 30:25 (4th ed. 2011)). However, Grimsley argues that "[t]he party would still 'need to know which . . . provisions were incorporated.'" *Id.* (quoting the same). Grimsley contends that "[w]ith respect to the FY24 Plan, there is not just a genuine dispute of material fact; it is undisputed that the FY24 Plan and its onerous terms (including the 'exceptional deal' clause) were not ascertainable by [ ] Grimsley at the time he signed the 2024 Compensation Letter." *Id.* at 27. In support of this conclusion, Grimsley invokes *Enterprise Information Management, Inc. v. SuperLetter.com, Inc.*, Civ. No. DKC-13-2131, 2013 WL 5964563 (D. Md. Nov. 7, 2013). However, Grimsley misapplies the holding of that case.

In *SuperLetter*, the plaintiffs "were on notice that provisions" from an arbitration agreement were incorporated into their contract, but there was "some dispute about how, or whether, they knew precisely *which* provisions were so incorporated." *Id.* at *7 (emphasis added). There, "explicit references" were made in the contract at issue to "CTT DOC 24 SCHED 2 TERMS AND CONDITIONS, which [itself] identifie[d]" the arbitration agreement defendant sought to invoke. *See id.* at *6. However, the contract defined the arbitration agreement "to mean only those terms that may be identified and incorporated elsewhere," rather than providing any indication as to specific terms and conditions incorporated. *Id.* at *5. Reviewing Maryland precedent, the Court concluded that a "party challenging incorporation need not have actually received the incorporated terms in order to be bound by them, especially when both parties are sophisticated business entities." *Id.* at *6–7 (citing *Ray*, 93 A.2d at 279). However, Judge Chasanow went on to hold

that although "[p]laintiffs need not have received a copy of the pertinent [agreement] in order to be bound by their terms, [p]laintiffs need[ed] to know which [agreement] provisions were incorporated." *Id.* at \*7. "Then, if the contents of the separate document could have been ascertained, and incorporation of the document would not result in surprise or hardship, [p]laintiffs would be bound." *Id.* The terms and conditions ultimately provided in *SuperLetter* "appear[ed] to list some, but maybe not all, of the [arbitration] provisions." *Id.* at \*5. Since it was not clear whether plaintiffs knew what provisions of the arbitration agreement were incorporated—due to the mismatch between the *entire* agreement being referenced but only *some* provisions being provided—the Court held that an evidentiary hearing on the matter was appropriate. *See id.* at \*7.[12]

A factual dispute analogous to what the Court encountered in *SuperLetter* is not present here. Neither party maintains that there is a dispute that Grimsley was not on notice as to *which provisions* of the FY24 Plan were incorporated into the FY24 Letter. Rather, the question is whether the incorporation by reference doctrine still applies where a party alleges that he never received nor read the referenced terms but signed a document expressly reflecting that he had. "[U]nder Maryland law, a party who signs a contract is presumed to have read and understood its terms and as such will be bound by its execution." *Holloman v. Cir. City Stores, Inc.*, 894 A.2d 547, 556 (Md. 2006); *see also Walther v. Sovereign Bank*, 872 A.2d 735, 754 (Md. 2005) ("If petitioners did not [read the agreement] before they signed the agreement, they have no persons to blame but themselves. . . . [W]e are loath to rescind a conspicuous arbitration agreement that was signed by a party whom now, for whatever reason, does not desire to fulfill that agreement.");

---

[12] The docket in *Superletter* confirms that while a hearing was scheduled, the matter was voluntarily dismissed by the plaintiffs before it took place.

*Binder v. Benson*, 171 A.2d 248, 250 (Md. 1961) ("[T]he usual rule is that if there is no fraud, duress or mutual mistake, one who has the capacity to understand a written document who reads and signs it, or without reading it or having it read to him, signs it, is bound by his signature as to all of its terms." (first citing *Ray*, 93 A.2d at 278; and then citing Restatement (First) of Contracts § 70 (1932)). "One is under a *duty* to learn the contents of a contract before signing it; if, in the absence of fraud, duress, undue influence, and the like he fails to do so, he is presumed to know the contents, signs at his peril, suffers the consequences of his negligence, and is estopped to deny his obligation under the contract." *Holzman v. Fiola Blum, Inc.*, 726 A.2d 818, 831 (Md. App. 1999) (emphasis added). So too here. Grimsley was under a duty to learn of the contents of the referenced FY24 Plan before he signed a two-page letter which expressly provided that his signature "attest[ed] that [he had] read and accepted the terms of this Letter *and the 2024 Fiscal Year SimSpace Sales Compensation Plan*." ECF 21-20, at 12 (emphasis added).

A final issue Grimsley raises regarding whether the FY24 Plan was incorporated by reference into the FY24 Letter is an allegation in his opposition memorandum that the FY24 Plan "was not yet in existence when the 2024 Compensation Letter was presented to, and signed by, [ ] Grimsley." ECF 23-2, at 6. As an initial matter, the Court agrees that the question of whether a non-existent document can be incorporated by reference into a contract presents a distinct issue. Other courts have indeed held that "an instrument may incorporate by reference only the terms of an instrument already in existence." *Loc. 1316, Int'l Bhd. of Elec. Workers v. Superior Contractors & Assocs., Inc.*, 608 F. Supp. 1246, 1249 (N.D. Ga. 1985) (quoting *Bricklayers International Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1029 (5th Cir. 1975)); *see also, e.g.*, *Pharmacy Corp. of Am. v. Askari*, Civ. No. 16-1123-RGA-MPT, 2018 WL 2108200, at *7 (D. Del. May 7, 2018), *report and recommendation adopted*, Civ. No. 16-1123-RGA, 2018 WL

3768988 (D. Del. Aug. 8, 2018); *Axis Venture Grp., LLC v. 1111 Tower, LLC*, No. 09-CV-01636PABKMT, 2010 WL 1278306, at *5 n.2 (D. Colo. Mar. 30, 2010). *But see PB Grp., Inc. v. Proform Thermal Sys., Inc.*, No. 06-CV-15755, 2008 WL 2714426, at *6 (E.D. Mich. July 8, 2008) ("[P]arties to an agreement may incorporate by reference documents that are not yet even in existence, let alone existing agreements that have not yet been executed."); *Lamb v. Emhart Corp.*, 47 F.3d 551, 559 (2d Cir. 1995) (applying Connecticut law to reach the conclusion that terms that "are to be decided by one party in the future" may be incorporated into a contract if there is "an ascertainable standard for the promulgation of the new terms that is set forth in the original agreement").

In support of his assertion that the FY24 Plan did not exist at the time of his signature, Grimsley directs the Court to paragraphs 22–24 of his "Statement of Material Facts in Dispute." ECF 23-2, at 6 ¶ 42. However, though the facts discussed in those paragraphs identify evidence that Grimsley did not *receive* the FY24 Plan before he signed the FY24 Letter, they do not create a genuine dispute of material fact that the FY24 Plan did not *exist* at the time Grimsley signed the FY24 Letter. *See* ECF 23-1, at 11–12 ¶¶ 22–24. In its independent review of the record, the Court observes that in an email Brewer sent to Grimsley on February 3, 2023, he stated that "[w]e are still drafting and finalizing the compensation plan for this year, and it needs to be approved." ECF 21-21, at 3. However, as Defendants point out, the record contains an email thread containing communications between November and December of 2022, which includes an attached draft of the FY24 Plan that is almost identical to the final version appended to Grimsley's document package. *See* ECF 26-3. Moreover, an email from Gorman to Grimsley, sent March 7, 2023 and thus well before Grimsley signed his FY24 Letter in late April, noted that Gorman was "[i]n the process of reviewing and finalizing all the comp plans now." ECF 21-22, at 3.

By rule, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1). "Genuine issues of material fact cannot be based on mere speculation or the building of one inference upon another." *Barwick v. Celotex Corp.*, 736 F.2d 946, 963 (4th Cir. 1984). While "it is the province of the jury to resolve conflicting inferences from circumstantial evidence . . . [p]ermissible inferences must still be within the range of reasonable probability." *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958), *cert. denied*, 358 U.S. 908 (1958). The Court has a "duty" to "withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Id.* As the Supreme Court cautioned when discussing when a civil case should go to a jury, "[w]hatever may be the general formulation, the essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked." *Galloway v. United States*, 319 U.S. 372, 395 (1943).

Though he points to testimony and emails suggesting he had not *read* or *received* the FY24 Plan when he signed his FY24 Letter, Grimsley fails to identify any evidence in the record reflecting that the FY24 Plan *did not exist* when he signed the FY24 Letter. *See* ECF 23-2, at 6 ¶ 42. If Grimsley had issues with being subject to the FY24 Plan, he could have easily raised them before signing the FY24 Letter agreeing to be bound by the terms of the FY24 plan. Accordingly, the claim that the FY24 Plan was not in existence at the time Grimsley signed the FY24 Letter

rests on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."  *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (citing *Bouchat*, 346 F.3d at 522).  Moreover, Grimsley does not dispute that he could have requested a copy of the FY24 Plan for review before he signed the FY24 Letter, and Grimsley accessed his letter with the FY24 Plan appended on April 29, 2023, just four days after he signed. ECF 21-26, at 2–3; *cf. Calderon v. Sixt Rent a Car, LLC*, 114 F.4th 1190, 1201–02 (11th Cir. 2024) (applying Florida law and holding that summary judgment was inappropriate because the "T&C" was incorporated by reference into a contract "even if we assume that none of the Plaintiffs received a copy of the T&C before signing the Face Page," where "[a]lthough [the plaintiff] testified that he was not given a copy of the T&C before he signed, there is no dispute that a copy of the Rental Jacket was available for his review at the counter (and, indeed, he was handed a copy of the Rental Jacket, at the latest, moments after he signed)").[13]

_____

[13] It also bears noting that after Grimsley was in receipt of the FY24 Plan, he continued to work at SimSpace without objection to the terms of his compensation until notice of his termination on January 30, 2024.  *See* ECF 21-48, at 2–4.  Indeed, in September of 2023, Grimsley sent an email to Brewer stating that he "did not get paid for the 318th, not paid for CWIT, and now wonder what happens with CYBER Florida," but Grimsley did not express that he believed he was owed compensation from those deals and acknowledged that his plan had been "restructured."  ECF 21-32, at 3.  "Importantly, an acceptance may be manifested by actions as well as by words." *Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79 (4th Cir. 2016) (citing *Porter v. Gen. Boiler Casing Co.*, 396 A.2d 1090, 1095 (Md. 1979)); *cf. Gordon v. Zeroed-In Tech., LLC*, Civ. No. 23-3284-BAH, 2025 WL 941365, at *14 (D. Md. Mar. 26, 2025) ("[C]ontinued employment can constitute assent under Maryland law, so long as both parties have actual or constructive knowledge of the agreement and the fact that continued employment amounts to assent."). "Notification of acceptance is not essential to the formation of a contract."  *Porter*, 396 A.2d 1090 at 1094.  Although Grimsley's continued employment at SimSpace was not expressly conditioned on his acceptance of the FY24 plan, it bears noting that for over nine months, Grimsley continued to perform his duties at SimSpace without objecting to his compensation under the terms of either his 2022 Offer Letter or the FY24 Letter and FY24 Plan.

For those reasons, the Court rejects Grimsley's argument that "a reasonable jury could find that the FY24 Plan was not properly incorporated in the 2024 Compensation Letter." *See* ECF 23-1, at 28. The Court next considers the content of the FY24 Plan and FY24 Letter, and whether SimSpace paid Grimsley wages in accordance with any agreement those documents created.

### iii. The Effect of the FY24 Plan and Compensation Letter

An MWPCL cause of action "assumes the existence of some sort of underlying contract[.]"[14] *Doe v. Cath. Relief Servs.*, 529 F. Supp. 3d 440, 451 (D. Md. 2021) (quoting *Cunningham*, 107 A.3d at 1203–04). That is because the MWPCL provides a cause of action to recover wages "if the remuneration [was] 'promised to the employee as compensation for work performed.'" *Id.* (quoting LE § 3-501(c)). Defendants argue that "the Fourth Circuit has routinely held that commission or incentive plans can limit an employee's commissions payments where the plan 'repeatedly and unreservedly' states that the employer can adjust an incentive or commission payment 'at its sole discretion.'" ECF 21-2, at 40 (quoting *Martignetti*, 855 F. App'x at 861). They attempt to analogize the FY24 Plan to the plans considered by the Fourth Circuit. *See id.* Grimsley argues that unlike the plans adjudicated there, "[t]he provisions of the 2024 Compensation Letter simply do not give Defendants the unfettered discretion to withhold or modify earned commissions." ECF 23-1, at 30. In keeping with his argument that the FY24 Plan was not incorporated by reference into the FY24 Letter, Grimsley bases his arguments solely on the content of the FY24 Letter. *See id.*

In *Martignetti v. International Business Machines Corp.*, the Fourth Circuit affirmed, albeit in an unpublished opinion, that a discretionary bonus is not considered a wage under the MWPCL.

---

[14] However, a "MWPCL claim does not require necessarily analysis of the parties' underlying contract, nor does an action under the MWPCL require that a breach of contract action be pursued contemporaneously. Instead, a MWPCL action may be an independent, stand-alone claim." *Cunningham*, 107 A.3d at 1204.

855 F. App'x at 860–61.  The plaintiff there, Martignetti, was a former salesman and manager of IBM, and "his compensation consisted of both a base salary and incentive compensation, the latter of which included commissions and bonuses."  *Id.* at 858.  Martignetti "earned incentive compensation in accordance with IBM's written plans" but his claims stemmed from a plan in effect during 2017, "the terms of which were conveyed through a PowerPoint document."  *Id.* IBM's plan provided that commissions were "uncapped" and included an earnings clause providing, among other things, that incentive payments were not earned unless the customer had paid the billing for the related sales or services transaction.  *Id.*  The plan further provided that IBM reserved the right to adjust incentive payments "where the incentive payment would be 'disproportionate'" compared with the individual's contribution towards the transaction.  *Id.* at 859.  Moreover, the plan included a disclaimer that it did "not constitute an express or implied contract or a promise by IBM to make any distributions under it" and IBM "reserve[d] the right to adjust the [p]lan terms" and to "modify or cancel the [p]lan, for any individual."  *Id.* (first alteration in *Martignetti*).  "Based on the commission calculation set out in the Plan, that amount of sales should have resulted in $928,543 in commissions" for Martignetti.  *Id.*  However, "[a]lthough IBM paid portions of what Martignetti had earned, it unilaterally and retroactively capped his commissions at 300% of his quota," leading him to allege he "was denied $526,000 in earned commissions."  *Id.*

Martignetti raised an MWPCL claim and argued that even though modification of the incentive plan was allowed, it was not allowed "*after* the commission was earned."  *Id.* at 860. And even if it was, because the disclaimers purported to "give way to contrary local law, [the plaintiff] contend[ed] that the MWPCL precluded IBM from reducing the amount of commissions after they had been earned."  *Id.* at 861.  The Fourth Circuit disagreed.  *See id.*  Specifically, it

concluded that the plain language of the plan and accompanying letter "preclude[d] counting the specific commission amounts [plaintiff sought] as 'wages' under the MWPCL." *Id.* "Put simply, IBM did not make a binding promise to pay [plaintiff] a particular rate of commission in exchange for his work." *Id.* The Fourth Circuit agreed that the plan set out the formula IBM intended to use but took note of the Plan's repeated and unqualified statements "that IBM could adjust the amount of any commission at its sole discretion." *Id.* "Because IBM never promised Martignetti that he would be paid a particular commission rate, unpaid amounts under the [p]lan's formula cannot be considered 'wages' under the MWPCL." [15] *Id.* (citing *Jensen v. Int'l Bus. Machs. Corp.*, 454 F.3d 382, 388 (4th Cir. 2006), as an analogous case).

This Court reached a similar conclusion in *Garcia v. Fujitec America, Inc.*, 621 F. Supp. 3d 577 (D. Md. 2022). There, the employer's incentive programs stated that the incentive payments were "subject to review and modification by [the president] and awarded as his discretion . . . subject to change at any time." *Id.* at 583–84 (citation omitted). The Court concluded that "[a] plain language reading of the documents in the record makes it clear that [the employer] did not 'promise' to pay [the plaintiff] commissions." *Id.* at 584. The Court also noted that the plaintiff's "*offer of employment* ma[de] no mention of commission or incentive payments." *Id.* (emphasis added). Accordingly, the plaintiff's MWPCL claim failed as a matter of law. *See id.* Likewise, in *Moon v. Veritas Technologies LLC*, this Court concluded that a MWPCL claim

---

[15] The plaintiff in *Martignetti* also brought common law claims for fraud, negligent misrepresentation, and unjust enrichment. 855 F. App'x at 861. After briefing had concluded in *Martignetti*, a separate panel of the Fourth Circuit "determined that materially indistinguishable claims on nearly identical facts were sufficient to survive dismissal under Rule 12(b)(6)." *Id.* (citing *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146 (4th Cir. 2020)). The Fourth Circuit, bound by that decision, thus vacated the district court's dismissal of the plaintiff's common law claims in *Martignetti* for the reasons stated in *Fessler*. *Id.* at 861–62. Here, Grimsley has only brought a single count under the MWPCL for failure to pay earned wages. *See* ECF 2, at 7.

failed as a matter of law where the employer's compensation plan entitled a plan participant to "variable pay" if three conditions were satisfied. Civ. No. 21-2750-BAH, 2025 WL 1865709, at *9 (July 7, 2025 D. Md.). Comparing the facts there to those in *Martignetti*, the Court observed that the plan "disclaimed that [d]efendant was undertaking any contractual obligation to pay [p]laintiff any *particular amount* of money and gave Defendant the right to review the formulaic amount of incentive compensation before [p]laintiff received it and to adjust it if, in [d]efendant's sole discretion, the amount was disproportionate as a result of, *inter alia*, error, unforeseen circumstances, or windfall." *Id.* at *10 (emphasis in original).[16]

---

[16] In *Moon*, however, the Court observed that it was not dealing with a case "where Defendant modified Plaintiff's quota to such a degree that he received no commission payment for the deal, or his compensation was conditioned on a provision antithetical to public policy." 2025 WL 1865709, at *10 (first citing *MedEx*, 811 A.2d at 305; and then citing *Hausfeld v. Love Funding Corp.*, 131 F. Supp. 3d 443, 461 (D. Md. 2015)). The Court clarified that "[h]ad Defendant entirely withheld compensation in the form of commission pay . . . , the result may be different because, as discussed above, Plaintiff was entitled to variable pay if he exceeded quota," and the Court could not interpret "variable pay" to mean "no pay." *Id.* at *10 n.29.

Grimsley has not argued that specific provisions of potential agreements at issue here—the FY24 Plan and FY24 Letter or 2022 Offer Letter—are antithetical to Maryland public policy. *See* ECF 23-1, at 20 (quoting *Medex* but elaborating no further). Nevertheless, the Court considers the argument. In *Medex*, the Supreme Court of Maryland invalidated a provision in "both the employment contract and incentive plan . . . that, to be eligible for the incentive fees, the employee must still be employed at the date of payment" because it was antithetical to the policy of the MWPCL. *Id.* at 37. The Court agrees that the FY24 Plan at issue contains a provision in Section II that appears analogous to that considered in *Medex*. ECF 21-20, at 2 ("In addition, Participant must be employed in good standing with SimSpace to earn commissions under this Plan. Being employed in good standing means that the Participant is actively employed by the Company, the Company has not provided the Participant with a notice of termination, and Participant has not provided the Company with a notice of termination."). However, the Court's conclusions in this opinion do not rest on that provision of the FY24 Plan. Moreover, the court reasoned in *Medex* that there was something particularly troubling about a provision tying *otherwise earned* wages to termination, because it "would place the rights of employees to these wages at the whim of the employer, who could simply terminate any at-will employee whose incentive fees it didn't wish to pay." 811 A.2d at 305. As the Court explains herein, some of Grimsley's commissions were not promised *at all* under the FY24 Plan, unlike the incentive fees in *Medex*, and thus SimSpace was not exercising the terms of the FY24 Plan at its whim to deprive Grimsley of a "wage" under the MWPCL.

SimSpace's FY24 Plan and FY24 Letter, like those plans discussed in *Moon*, *Garcia,* and *Martignetti*, made the payment of FY24 commissions subject to the discretion of SimSpace in several respects. *See, e.g.*, ECF 21-20, at 12 (FY24 Letter stating that "SimSpace reserves the right to modify, amend, suspend, and/or terminate the terms of this Letter at any time"); ECF 21-20, at 2 (FY24 Plan stating that SimSpace was "the sole administrator of this plan and may, at its sole discretion, *prospectively* change this Plan, implement a new plan, eliminate this or any future plan at any time." (emphasis added)). SimSpace made clear that it was reserving its right to adjust the FY24 Plan terms and modify or cancel the plan as to any participant prospectively.[17] *Cf.*

---

[17] Although neither party raises the issue, this language raises some cause for concern. "Under Maryland law of contract, illusory contracts are unenforceable." *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 670 (Md. 2009) (quoting *Cheek v. United Healthcare of the Mid–Atl., Inc.*, 835 A.2d 656, 662 (Md. 2003)). "An illusory promise appears to be a promise, but it does not actually bind or obligate the promisor to do anything." *Id.* (internal quotation marks omitted) (quoting *Cheek*, 835 A.2d at 662). "A promise, therefore, is illusory if 'the promisor retains an unlimited right to decide later the nature or extent of his performance.'" *Id.* (internal quotation marks omitted) (quoting *Cheek*, 835 A.2d at 662). "An unlimited right to determine how to perform, or whether to perform at all, negates the promise to perform." *Id.* "This notwithstanding, courts generally "prefer a construction [of a contract] which will make the contract effective rather than one which will make it illusory or unenforceable." *Id.* (quoting *Kelley Constr. Co. v. Wash. Suburban Sanitary Comm'n*, 230 A.2d 672, 676 (1967)).

The FY24 Plan contains a unilateral change in terms clause with the restriction that changes to the FY24 Plan are only effective prospectively and that changes to the FY24 Letter may only be made where "[t]o the maximum extent possible," SimSpace provides the participant "with prior verbal, written or email notice of that amendment, modification, suspension, or termination." ECF 21-25, at 4; ECF 21-20, at 12. In the context of an arbitration agreement, where such clauses often appear, "courts in the Fourth Circuit have consistently found such an agreement to be illusory, unless the empowered party is limited in some way." *Kiser v. Truist Fin. Corp.*, 796 F. Supp. 3d 207, 236 (E.D. Va. 2025) (collecting cases). The Fourth Circuit has before found, applying Maryland law, a clause permitting a party to "change *any* term of [the] Agreement in [its] *sole discretion*, upon such notice . . . as is required by law" was illusory. *Johnson v. Cont'l Fin. Co., LLC*, 131 F.4th 169, 179 (4th Cir. 2025). In so holding, the Fourth Circuit observed that a limitation merely committing a party "to do what it is already required to do by law . . . cannot furnish consideration." *Id.* at 180. Taking the notice and prospective restrictions together, however, the Court would likely conclude that the FY24 Plan and FY24 Letter are not rendered illusory, had the parties raised the issue.

*Martignetti*, 855 F. App'x at 859–60.  However, the FY24 Plan stated that any prospective change would not affect any Commissions . . . earned on or before the effective date of such change." ECF 21-20, at 7.

The record reflects that SimSpace never sought to modify Grimsley's FY24 Plan or FY24 Letter and merely exercised the discretion afforded to it under the relevant contractual provisions. On the topic of commissions, Section VIII of the FY24 Plan provided in relevant part that "Commissions become *earned* on a Transaction when SimSpace is paid in full by the Customer or Partner" and would become "due and payable" when, among other requirements, the CRO and CFO considered the plan participant's letter and relevant provisions of the FY24 Plan.  ECF 21-20, at 6.  Moreover, the Exceptional Deals clause, contained in Section XI of the FY24 Plan, provided that "if any of the following situations occur, SimSpace management will review the Transaction, and may determine, *in its discretion and without prior notice, to modify, limit, reduce, or eliminate the affected Participant's Quota Credit or Special Incentive* on the Transaction: . . . B. Transaction ACV is >40% of Participant's Quota" and "C. Transaction ACV is greater than $1 Million."[18]  *Id.* at 7.  Moreover, in the event of termination of employment, Section XIV provided that a participant would cease earning any compensation, including commissions.  *See id.* at 8.

Grimsley asserts that the "provisions of the 2024 Compensation Letter"—and, by implication, the provisions of the FY24 Plan—"simply do not give Defendants the unfettered

---

[18] Although neither party reckons with this point, the Court observes that the Exceptional Deals clause only applies to a participant's "quota credit or special incentive," not expressly to commissions.  However, because the FY24 Plan defines "'quota credit' as the amount of ACF on a Transaction closed by a Participant credited towards the Participant's Quota," ECF 21-20, at 4, and provides that "Participants are paid Commission based on their BCR on any quota attainment up to 100%, and/or as specified in their Letter," *id.* at 3, it follows that SimSpace would be able to effectively reduce or eliminate an employee's commission by reducing or eliminating the quota credit afforded for a qualifying deal.

discretion to withhold or modify earned commissions." ECF 23-1, at 30. To some extent, Grimsley is right. Grimsley's FY24 Letter provided that his BCR was 15.5% for FY24, and nothing in the FY24 Plan, or any changes made thereto, made the application of Grimsley's BCR wholly discretionary—*except* where the Exceptional Deals clause applied. Where a transaction's ACV was greater than 40% of an employee's quota or where the transaction's ACV was greater than $1 million (among other triggers), the FY24 Plan gave SimSpace the ability to "determine, in its discretion and without prior notice, to modify, limit, reduce, or eliminate" the employee's quota credit, thereby modifying or eliminating the employee's commission. ECF 21-20, at 7. The Court must decide, then, whether the deals Grimsley identifies were deals in which he actually *earned* commissions according to the terms of his employment under the FY24 Plan and FY24 Letter and, if so, whether and to what extent commission payments were modified or eliminated.

### iv.    The Effect of the 2022 Offer Letter

To the extent Grimsley alleges he is owed commission from deals before he signed the FY24 Letter, the terms of his original employment agreement would govern whether he was promised commissions. The 2022 Offer Letter provides that Grimsley would be paid "an annualized on-target commission of $240,000," the "specifics" of which would be "detailed in your 2022 Sales Compensation Plan, which will be provided to you in your first week with the company." ECF 21-13, at 2. It is not clear whether such a plan existed or was ever provided to Grimsley. *See* ECF 23-4, at 7, 21:15–18. Regardless, the 2022 Offer Letter further provided that the "[c]ommission arrangement will be subject to periodic review and adjustments at the Company's discretion." ECF 21-13, at 2.

Massachusetts law applies to the interpretation of the 2022 Offer Letter. *See supra* Section III.B.1.i. In Massachusetts, "[w]hen the words of a contract are clear they alone determine the meaning of the contract." *EventMonitor, Inc. v. Leness*, 44 N.E.3d 848, 856 (Mass. 2016) (quoting

*Merrimack Valley Nat'l Bank v. Baird*, 363 N.E.2d 688, 690 (Mass. 1977)).  "When contract language is unambiguous, it must be construed according to its plain meaning." *Id.*  "A reviewing court considers extrinsic evidence only when a term in a contract is ambiguous." *Id.*  "Contractual language is ambiguous when it 'can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.'" *Balles v. Babcock Power Inc.*, 70 N.E.3d 905, 911 (Mass. 2017).  "To determine whether the language at issue is ambiguous, we look both to the contested language and to the text of the contract as a whole." *Id.* at 912.

"Contract interpretation 'depends heavily on context' and proceeds on the presumption that 'the parties were trying to accomplish something rational.'" *Wipro Ltd. v. Analog Devices, Inc.*, 527 F. Supp. 3d 93, 98 (D. Mass. 2021) (first quoting *McAdams v. Massachusetts Mut. Life Ins. Co.*, 391 F.3d 287, 299 (1st Cir. 2004); and then quoting *Fishman v. LaSalle Nat. Bank*, 247 F.3d 300, 302 (1st Cir. 2001)).  "[C]ommon sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." *Id.* (alteration in *Wipro*) (quoting *Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 9 (1st Cir. 2006)).  "Thus, a contract should be interpreted in a manner that avoids absurd results and 'give[s] it effect as a rational business instrument.'" *Id.* (alteration in *Wipro*) (quoting *Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P.*, 99 N.E.3d 744, 754 (Mass. 2018)).

The parties dispute whether Grimsley earned any commissions under the terms of the 2022 Offer Letter.  Grimsley argues that there was no mandate in the 2022 Offer Letter that Grimsley "was not entitled to any commissions until he reached his full quota." ECF 23-1, at 31.  Grimsley contends that the letter "simply recognizes that his target commission was $240,000, a number that would be reached if he reached a sales quota of $2,000,000." *Id.*  Defendants respond that Grimsley "ignores the very definition of a sales quota," ECF 26, at 32, and quoting from *Black's*

*Law Dictionary*, note that a "quota" is "[a]n official . . . amount of something that is . . . required over a given period; a minimum . . . number," *id.* (quoting *Quota*, Black's Law Dictionary (12th ed. 2024)).  In addition to the meaning of "quota," the Court additionally observes that a key issue is the meaning of "annualized on-target commission."  *See* ECF 21-13, at 2.

Considering the plain meaning of those terms and their use in the document as a whole, as well as the Massachusetts high court's instruction to interpret such agreements in light of their use as "rational business instrument[s]," *see Homeowner's Rehab, Inc.*, 99 N.E.3d at 754, the Court concludes that the 2022 Offer Letter conditioned Grimsley's commission on reaching his quota. The 2022 Offer Letter defines "on-target earnings" to include "at-risk earnings" such as the "annualized on-target commission of $240,000," and the letter states that "on-target earnings" will be earned "upon achievement of your sales targets as outlined in your 2022 Sales Compensation Plan." ECF 21-13, at 2.  Although Grimsley's "base salary" was also included as a part of the "on-target earnings," the use of the adjectival phrase "at-risk earnings" to apply to Grimsley's "annualized on-target commission of $240,000" is telling.  *See id.*  The plain meaning of "at-risk" as applied to "earnings" suggests that the earnings may not be earned under some conditions—*i.e.*, they are exposed to the possibility of loss.  *See At-Risk*, Oxford English Dictionary (rev. 2023), https://www.oed.com/dictionary/at-risk_adj (defining "at-risk" as "exposed to the possibility of loss, harm, or other adverse or unwelcome circumstance"); *see also Risk*, Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/at-risk (last accessed Jan. 23, 2026) (defining "risk" as "the possibility of loss, injury, disadvantage, or destruction").  And although the 2022 Sales Compensation Plan has not been produced in this record, the parties agree that Grimsley's sales target for FY23 was $2,000,000.  *See* ECF 21-5, at 18 (deposition of Grimsley).

Further, to the extent it is relevant, this common-sense interpretation of the 2022 Offer Letter's terms also comport with Grimsley's own interpretation. When asked at his deposition what his understanding was "of what [he] needed to do to earn that commission" under the terms of the 2022 Offer Letter, Grimsley stated "$2 million in quota." ECF 21-5, at 18, 61:12–14. It appears that kind of commission structure was also what Grimsley encountered at his prior position at Leidos, where he did not earn incentive payments because "Leidos does not compensate until you sell something over $100 million, and I did not close a deal over $100 million during my time there." ECF 23-9, at 12, 39:1–19. Accordingly, for any deals that closed during the time in which the 2022 Offer Letter governed, Grimsley was only entitled to earn commission if he achieved his sales quota.

2. Whether Grimsley was Paid Commissions in Accordance with the Governing Agreements

Under the terms of the FY24 Plan, SimSpace argues that the record "establishes that none of the seven (7) deals at issue are commissionable to [Grimsley]." ECF 21-2, at 44. Aside from the MCTOEA deal,[19] the Court addresses each deal at issue below.

i. 318th RANS Deal

The 318th RANS deal closed at the end of January of 2023. See ECF 21-28, at 2; ECF 21-52, at 2. The deal's ACV was approximately $537,500. ECF 21-28, at 2; ECF 21-52, at 2. Section I of the FY24 Plan set its effective date as "February 1, 2023" and made itself applicable "to all sales compensation earned on or after February 1, 2023 through January 31, 2024 (the 2024 Fiscal Year), or until any earlier date on which it is terminated by SimSpace (the 'Plan Period')." ECF

_____

[19] Grimsley agrees that he earned no commissionable sales throughout the 2023 fiscal year, other than the MCTOEA deal, which Grimsley affirms was paid fully by SimSpace. See ECF 21-5, at 26, 93:1–11, at 31, 127:9–22

21-20, at 2.  Accordingly, the 2022 Offer Letter would apply to Grimsley's compensation with respect to this deal.

However, for the reasons described above, Grimsley was only entitled to commission from a deal closed in FY23 if he achieved his sales quota for that year, $2 million.  *See supra* Section III.B.1.iv.  At his deposition, when Grimsley was asked whether he was "contending that [he] closed $2 million in new sales between October 10th, 2022, and February 1st, 2023," Grimsley responded, "No, I did not."  ECF 21-5, at 18, 61:17–20.  Thereafter, when asked whether he would "be entitled to commissions prior to February 1st, 2023," Grimsley responded, "[n]ot that I know of for a deal."  *Id.* at 18–19, 61:21–62:5.  The Court thus concludes that there is no genuine dispute of material fact as to whether Grimsley was entitled to any commission from the 318th RANS deal; he was not so entitled.

### ii.    IARPA Deal

The Court observes that Grimsley fails to address the IARPA deal beyond a passing reference to the existence of the deal in his "Statement of Material Factual Disputes."  *See* ECF 23-1, at 20–1 ¶ 54.  Neither does Grimsley advance arguments as to why he is entitled to commissions from that deal in the legal argument section of his memorandum.  *See id.* at 23–34. Defendants argue, *see* ECF 26, at 32 n.3, and the Court agrees, that Grimsley has thus abandoned his claim for commissions for that deal.  *See Rodgers v. Eagle All.*, 586 F. Supp. 3d 398, 448–49 (D. Md. 2022) ("A plaintiff who fails to respond to an argument for summary judgment is deemed to have abandoned the claim." (first citing *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 783 (D. Md. 2010); and then citing *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997))).

### iii.    PCTE-CWIT Deal[20]

The PCTE-CWIT deal had an ACV of $2.6 million and was closed on or about July 31, 2023.  *See* ECF 21-4, at 9, 36:12–18; ECF 21-5, at 45, 160:11–14; ECF 21-30, at 2.  Grimsley was listed as the opportunity owner of the deal in Salesforce.  ECF 21-4, at 9–10, 36:19–21; ECF 21-5, at 45–46, 160:21–161:2, at 46–47, 161:14–162:3; ECF 23-4, at 11, 36:19–21.  The deal was marked as "closed won" in Salesforce, meaning that "[a] quote was made and there was a contract put in place."  ECF 21-5, at 46, 161:3–13; *see also* ECF 23-8, at 16, 57:14–17 ("Yes.  Typically, a closed won indication is that a deal was closed.").

Because the PCTE-CWIT deal's ACV was over $1 million, it triggered the FY24 Plan's Exceptional Deals clause.  *See* ECF 21-20, at 7.  The PCTE-CWIT deal was the first deal to which SimSpace applied the clause.  ECF 21-4, at 12, 41:8–17; ECF 23-8, at 21, 74:6–9.  Consequently, SimSpace did not count any of the $2.6 million from the PCTE-CWIT deal towards Grimsley's quota, nor did it pay him any commission for his work associated with the deal.  ECF 21-4, at 10, 37:1–8; *see also* ECF 21-18, at 9, 65:4–8.  Apparently, no one at SimSpace received a commission on the deal, although Hansen and Murphy, Grimsley's two sales engineers on the Federal Sales team, were paid performance bonuses after the deal was closed.  *See* ECF 21-18, at 9, 65:9–13; ECF 21-4, at 14, 53:1–9; ECF 21-5, at 47, 162:14–22; ECF 21-17, at 12, 46:10–47:6.

Grimsley advances two arguments as to why non-payment of commission on this deal was improper.  First, he argues that his "entitlement to be paid had already been earned," ECF 23-1, at 32, so the Exceptional Deals Clause should not have applied.  However, Grimsley misreads the

---

[20] In the complaint, throughout the briefing, and in a variety of materials, the deal is referred to as "PCTE-CWIT."  *See, e.g.*, ECF 2, at 6 ¶ 28.  However, Gorman stated at his deposition that he believed that acronym stood for "Center for Information Warfare Training," so the proper acronym would actually be "CIWT."  *See* ECF 23-8, at 30, 110:14–20.  However, because the deal is consistently referred to using the acronym "CWIT," the Court does so in its opinion as well.

Exceptional Deals clause.  The clause provides that with respect to "exceptional deals," SimSpace would "review the Transaction" and "determine, in its discretion and without prior notice, to modify, limit, reduce, or eliminate" quota credit, thereby modifying, reducing, or eliminating commission.  *See id.*  As such, on certain deals, the clause applies to determine *whether* a commission was earned, not to alter a prior entitlement.  *See* ECF 21-20, at 7.  SimSpace used the Exceptional Deals Clause to do exactly that with respect to the PCTE-CWIT deal.  At his deposition, Hutchison explained that SimSpace management "took a number of factors into consideration" in their review, including Grimsley's "actual involvement," "the amount of the deal," and "the financial status of the company."  *Id.* at 37:9–16.  Hutchison noted that the management "felt that [Grimsley] had very little, if anything, to do with the CWIT deal."  *Id.*

Whether or not that was true as a factual matter, under the FY24 Plan SimSpace had "discretion" to make that decision on any Exceptional Deal.  It is true, as Grimsley cites, that "[i]n accordance with the policy underlying the Maryland Act, an employee's right to compensation vests when the employee does everything required to earn the wages."  *Medex*, 811 A.2d at 305.  But the existence of the Exceptional Deals clause in the FY24 Plan meant that Grimsley could not "earn" the wage until SimSpace undertook its review.  *See* ECF 21-20, at 7; *Blanch v. Chubb & Sons, Inc.*, 124 F. Supp. 3d 622, 635 (D. Md. 2015) ("'[O]nly when wages have been promised as part of the compensation for the employment arrangement and *all conditions agreed to in advance* for earning those wages have been satisfied' does the MWPCL require payment." (quoting *Whiting-Turner*, 783 A.2d at 672–73)).  For similar reasons, Grimsley's second argument falls flat.  Grimsley points to evidence in the record that suggests "Defendants were singling out [ ] Grimsley from receiving the commission," ECF 23-1, at 32, specifically because Hansen and Murphy were paid bonuses "roughly equal to what they would have gotten for the CIWT bonus."

51

ECF 23-12, at 2. However, Grimsley does not explain why SimSpace was not entitled to exercise its discretion in this way under the FY24 Plan. The Exceptional Deals clause allows a determination to be made with respect to "the affected Participant," rather than a blanket determination as to the overall deal. ECF 21-20, at 7. Accordingly, no reasonable jury could conclude that Grimsley was entitled to commissions from the PCTE-CWIT deal.

### iv.    Cyber Florida Deal

The Cyber Florida deal closed in December of 2023, and the ACV for the Cyber Florida deal was approximately $2 million. ECF 21-4, at 16, 57:12–14; ECF 21-28, at 3; ECF 21-5, at 75, 230:10–14. Grimsley was listed as the sales representative for SimSpace on the Cyber Florida deal. ECF 23-8, at 17, 59:6–14. Like the PCTE-CWIT deal, Defendants invoked the Exceptional Deals clause, but this time Grimsley received a reduced commission amount of $155,000 for the deal, rather than no commission at all. ECF 21-5, at 69, 207:2–5; ECF 21-44, at 6; ECF 21-46, at 2. For the same reasons described with respect to the PCTE-CWIT deal, the Court concludes that there is no genuine dispute of material fact as to whether Grimsley was entitled to more than the commission he received—he was not.

### v.    FBI Deal

The FBI deal at issue—the "upsell," or deal increasing an existing contract's value—closed on August 9, 2023, and had an ACV of $400,000. *See* ECF 23-34, at 3; ECF 21-52, at 2; ECF 21-27, at 2. Hutchison stated at his deposition that Michelle Neisser, the Vice President of Customer Success at the time, was generally responsible for SimSpace's relationship with the FBI, *see* ECF 21-4, at 25–26, 105:10–106:8, and Grimsley agreed that Neisser handled the FBI account prior to his arrival at SimSpace and further agreed that he did not take over the FBI relationship when he began his employment. ECF 21-5, at 49–50, 168:21–169:1. However, in July of 2023, the FBI apparently reached out to SimSpace for "additional content," and Grimsley stated that he was

either told to or volunteered to work on "a different contracting vehicle to be able to do the upsell." ECF 21-5, at 50, 169:2–11. Grimsley asserted at his deposition that he "would not have" entered that deal into Salesforce because it was "an upsell to a current agreement." ECF 21-5, at 41, 146:14–22, at 49, 168:4–20. SimSpace awarded commission on the deal to Neisser because she was listed as the opportunity owner in Salesforce for both the upsell and a separate deal, a contract renewal with the FBI, that occurred on the same day. *See* ECF 21-27, at 2.

Grimsley argues that "because the deal occurred in [his] territory, there was no requirement that he be responsible for bringing the deal into SimSpace, entering the deal in SaleForce.com or listing himself as the Opportunity Owner." ECF 23-1, at 33. Under the terms of the FY24 Letter, Grimsley asserts that "such actions were only required for deals that occurred outside [ ] Grimsley's territory." *Id.* However, Grimsley does not explain which terms of the FY24 Letter lead him to that conclusion. *See id.* Defendants respond that Grimsley's argument fails because it "rests entirely on the incorrect assumption that the FY24 Sales Compensation Plan was not binding on him." ECF 26, at 34.

First, the Court reads the terms of the FY24 Letter differently than Grimsley. The top of the FY24 Letter provides that Grimsley's "territory" was "US Federal," and the body of the letter further defines "territory" as "US Government Sales" not inclusive of "FMS or Allied Government Transactions, regardless of geographic location." ECF 21-20, at 11. The FY24 Letter mentions "territory" one other time, at the bottom of the first page: "At the sole discretion of the CRO and CFO, Quota Credit may be given and Commissions paid for Transactions booked outside of the Territory, provided it can be shown in Salesforce.com that Participant was directly involved." *Id.* That the FY24 Letter includes a provision related to how an employee might earn a commission for transactions outside of that employee's territory does not necessarily imply the inverse for

transactions within the employee's territory.  Indeed, the Court does not read the FY24 Letter to specify how commissions are defined as earned within an employee's territory at all.

However, the FY24 Plan does define when commissions are earned.  *See* ECF 21-20, at 2 ("Participants earn Commissions in accordance with this Plan . . . . Commissions do not become earned for a Transaction until SimSpace receives full customer payment of the ACV . . . ."); *see also id.* at 6–7 ("earning and payment of commissions and special incentives").  Most relevant, the Exceptional Deals clause provides that "all Participants are required to accurately, fully, and timely enter prospective sales opportunities in Salesforce" and "[a]ll opportunities/Transactions must be accurately entered and maintained in Salesforce."  *Id.* at 7.  "In the event that a Transaction is not properly forecasted, . . . SimSpace management will review the Transaction, and may determine, in its discretion and without prior notice, to modify, limit, reduce, or eliminate the affected Participant's Quota Credit or Special Incentive on the Transaction."  *Id.*

Grimsley does not assert that he forecasted the deal in Salesforce pursuant to the FY24 Plan.  Rather, he asserts that he did not need to pursuant to the FY24 Letter.  But even if the Court were to read the body of the FY24 Letter to render it unnecessary to enter the deal according to the commission procedures described in the FY24 Plan, the Court would still conclude that the FY24 Plan's Exceptional Deal clause governed the FBI deal.  That is because the FY24 Letter provides that in the case of "[a]ny conflict between the terms of this Letter and the Plan, the Plan shall govern."  *Id.* at 12.  Assuming Grimsley has established a genuine dispute of material fact as to his involvement in the FBI deal, SimSpace nevertheless retained the discretion under the FY24 Plan to "modify, limit, reduce, or eliminate" any commissions Grimsley otherwise would have earned because he did not "accurately enter[] and maintain[]" the deal in Salesforce.  *See id.* at 7.

> vi.    *BAH-NFR Deal*

The BAH-NFR deal closed on or about December 28, 2023, and its ACV was approximately $196,321.  *See* ECF 21-27, at 2; ECF 23-1, at 19.  Neisser was listed as the sales representative and opportunity owner for SimSpace in Salesforce on the $196,321 BAH-NFR deal.  ECF 21-5, at 66–67, at 204:5–205:2, at 68, 206:7–16.  For the same reasons as the FBI deal, Grimsley argues that he is entitled to commission on the BAH-NFR deal.  *See* ECF 23-1, at 19 ¶ 47; ECF 21-37, at 2–5 (email chain noting that quote for the BAH-NFR deal was "fully executed").  Grimsley argues that because the BAH-NFR deal was "within" his "territory," ECF 23-1, at 19 ¶ 47, he is entitled to commission on the deal.  But the Exceptional Deals clause provides that "all Participants are required to accurately, fully, and timely enter prospective sales opportunities in Salesforce" and "[a]ll opportunities/Transactions must be accurately entered and maintained in Salesforce."  ECF 21-20, at 7.  Yet, like the FBI deal, Neisser was listed as the sales representative for SimSpace on the signed quote and the opportunity owner in Salesforce.  ECF 21-27, at 2–3; ECF 21-37, at 4.  Thus, for the same reasons as the FBI deal, the Court concludes Grimsley was not entitled to commissions for the BAH-NFR deal under the MWPCL.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment is granted, and the Clerk is directed to close the case.

A separate implementing order will issue.


Dated: <u>February 19, 2026</u>                                   <u>          /s/          </u>
                                                                    Brendan A. Hurson
                                                                    United States District Judge